**PLANNED PARENTHOOD OF SOUTHEASTERN PENNSYLVANIA, Reproductive Health and Counseling Center Women's Health Services, Inc., Women's Suburban Clinic, Allentown Women's Center, Northeast Women's Center, Allen, Thomas, M.D., on behalf of himself and all others similarly situated**

v.

**CASEY, Robert P., Richards, N. Mark, Preate, Ernest, personally and in their official capacities, and Marino, Michael D., personally and in his official capacity, together with all others similarly situated.**

**Robert P. Casey, N. Mark Richards and Ernest D. Preate, Jr., Appellants.**

**No. 90–1662.**

United States Court of Appeals, Third Circuit.

Argued Feb. 25, 1991.

Decided Oct. 21, 1991.

---

Ernest D. Preate, Jr., Atty. Gen., Kate L. Mershimer (argued), Calvin R. Koons, Sr. Deputy Attys. Gen., John G. Knorr, III, Chief Deputy Atty. Gen., Chief, Litigation Section, Harrisburg, Pa., for appellants.

Thomas E. Zemaitis, Stephen J. Cipolla, Jody Kathleen Marcus, Pepper, Hamilton & Scheetz, Linda Wharton, Women's Law Project, Philadelphia, Pa., Kathryn Kolbert (argued), American Civil Liberties Union, Reproductive Freedom Project, Roger K. Evans, Dara Klassel, Planned Parenthood Federation of America, Inc., New York City, Seth Kreimer, University of Pennsylvania Law School, Philadelphia, Pa., for appellees.

Susan Oliver Renfer, Ann–Louise Lohr, Kevin J. Todd, Americans United for Life, Chicago, Ill., John E. McKeever, Philadel-

phia, Pa., for amicus curiae, American Academy of Medical Ethics.

Phyllis Gelman, Nancy A. Breslow, New York City, Barbara J. Hart, Pennsylvania Coalition Against Domestic Violence, Reading, Pa., for amicus curiae, Pennsylvania Coalition Against Domestic Violence, Pennsylvania Coalition Against Rape, New Jersey Coalition for Battered Women, Women's Coalition of St. Croix, Virgin Islands, Families in Transition Center of Milford, Del., National Clearinghouse for the Defense of Battered Women, National Coalition Against Domestic Violence, National Woman Abuse Prevention Project, Domestic Violence Research and Resources, Connecticut Coalition Against Domestic Violence, Clinton County Women's Center, Hospitality House Services for Women, Inc., Laurel House, Pennsylvania Campaign for Choice Survivors, Inc., Tioga County Women's Coalition, Women Against Abuse, Inc. and Women Against Abuse Legal Center, Inc., Women's Center & Shelter of Greater Pittsburgh.

James Eiseman, Jr., Drinker, Biddle & Reath, Philadelphia, Pa., for amicus curiae, Pennsylvania Chapter of the American College of Emergency Physicians.

Before STAPLETON, ALITO, and SEITZ, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

Five abortion clinics and one physician (the "clinics") raise a facial constitutional challenge to certain 1988 and 1989 amendments to the Pennsylvania Abortion Control Act of 1982 (the "Act"). *See* 18 Pa. Cons.Stat.Ann. §§ 3201–3220 (1983 & Supp. 1991). The United States District Court for the Eastern District of Pennsylvania held that §§ 3205 (informed consent), 3206 (parental consent), 3209 (spousal notice), 3214(a) (reporting requirements), and 3207(b) and 3214(f) (public disclosure of clinics' reports) violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Commonwealth defendants (the "Commonwealth") appeal. Because we find unconstitutional only § 3209, which requires notice to a spouse of a planned abortion, we will affirm in part and reverse in part.

## I.

The clinics filed a complaint alleging that certain 1988 amendments to the Pennsylvania Abortion Control Act of 1982 were facially unconstitutional. The district court issued a preliminary injunction. Thereafter, the court stayed all proceedings pending the Supreme Court's decision in *Webster v. Reproductive Health Services* in the summer of 1989. After the *Webster* decision, the Pennsylvania legislature passed further amendments to the Act. The clinics filed an amended complaint to include the 1989 amendments within the scope of their challenge, and the district court extended the preliminary injunction to include the 1989 amendments. The district court then conducted a three-day trial and issued an opinion holding several sections of the Act unconstitutional. 744 F.Supp. 1323. The Commonwealth filed this timely appeal. The clinics have not cross-appealed on the provisions upheld by the district court. The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

In *Webster v. Reproductive Health Services*, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), the Supreme Court declined to reconsider *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), because the Missouri abortion regulations at issue in *Webster* did not conflict with *Roe*, which held that a statute which "criminalized the performance of *all* abortions, except when the mother's life was at stake ... unconstitutionally infringed the right to an abortion." *Webster*, 492 U.S. at 521, 109 S.Ct. at 3058 (opinion of Rehnquist, C.J.). Like *Webster*, this appeal does not directly implicate *Roe;* this case involves the regulation of abortions rather than their outright prohibition. The threshold question is whether the standard of review of abortion regulations promulgated by the

Court in *Roe* and in later cases such as *Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), and *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), has survived *Webster* and the Court's subsequent decision in *Hodgson v. Minnesota,* —— U.S. ——, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990).

As Justice O'Connor cogently observed in an equal protection case alleging racial discrimination, a "dispute regarding the appropriate standard of review may strike some as a lawyers' quibble over words, but it is not. The standard of review establishes when the Court and Constitution allow the Government to employ racial classifications. A lower standard signals that the Government may resort to racial distinctions more readily." *Metro Broadcasting, Inc. v. FCC,* —— U.S. ——, 110 S.Ct. 2997, 3033, 111 L.Ed.2d 445 (1990) (O'Connor, J., dissenting). Similarly, the standard of review used for abortion legislation establishes the degree to which the government may regulate abortion. Because of its importance to the resolution of the issues before us, we discuss at some length our reasons for selecting the standard we will subsequently use in analyzing the challenged provisions of the Pennsylvania Act. We will first examine the different standards of review that have been suggested by various Justices as appropriate for reviewing abortion regulations. Then we will consider the rules of *stare decisis* that must be employed in determining which of these standards we must apply in this case.

### A.

The choice of a standard of review in a substantive due process case turns on whether a "fundamental right" is implicated. The Justices of the Supreme Court were divided in *Roe v. Wade* and have continued to be divided over whether the right to an abortion is a fundamental right under the Due Process Clause.[1] Accordingly, they have disagreed over the proper standard to apply in reviewing abortion regulations. The majority in *Roe* concluded that abortion was a fundamental right and, therefore, applied strict scrutiny review, the standard of review generally applied in fundamental rights cases. *See Roe,* 410 U.S. at 155, 93 S.Ct. at 728. The dissenters in *Roe* contended that abortion was not a fundamental right and thus judicial review of abortion regulations under the Due Process Clause should be no different from review of any social or economic legislation implicating a liberty interest. Therefore, they urged that the Court apply the deferential rational basis test traditionally used to review social and economic legislation. *See id.* at 173, 93 S.Ct. at 737 (Rehnquist, J., dissenting).[2] Justice O'Connor has referred to the right to abortion as a "limited" fundamental right and adopted a middle ground between these two positions. She uses the strict scrutiny standard if the regulation at issue causes an "undue burden" on a woman's abortion decision and the rational basis standard if it

---

1. The Due Process Clause of the Fourteenth Amendment states: "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. xiv. Though the Due Process Clause, read literally, is a guarantee only of fair procedures when the government deprives a person of life, liberty, or property, the Supreme Court has held under the "substantive due process" doctrine that there is more to the Due Process Clause than this guarantee of procedural fairness. Government interference with personal rights within the scope of the life, liberty, or property umbrella of the Due Process Clauses must be justified by a legitimate state interest; government interference with a "fundamental right" may be justified only by the most important of state interests.

2. The *Roe* dissenters argued that only those rights "implicit in the concept of ordered liberty" or "deeply rooted in this Nation's history and tradition" are fundamental rights and that the right to an abortion does not meet that standard. *See Roe,* 410 U.S. at 174, 93 S.Ct. at 737 (Rehnquist, J., dissenting); *Thornburgh,* 476 U.S. at 793, 106 S.Ct. at 2196 (White, J., dissenting). The *Roe* majority stated that there is a fundamental right to privacy. This right includes "the right of the *individual,* married or single, to be free from unwarranted government intrusions into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird,* 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972).

does not. *See Akron,* 462 U.S. at 453, 465 n. 10, 103 S.Ct. at 2504, 2511 n. 10 (O'Connor, J., dissenting).

#### 1.

In *Roe,* the Court held that the fundamental right of privacy protected by the Due Process Clause of the Fourteenth Amendment was "broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Roe,* 410 U.S. at 153, 93 S.Ct. at 727. Thus, the Court stated that a regulation limiting that fundamental right must meet the strict scrutiny test; it must be justified by a "compelling state interest" and "must be narrowly drawn" to serve that interest. *Id.* at 155, 93 S.Ct. at 728. The Court held that the state's interests in maternal health and in the potential life of the fetus become compelling at different points in a woman's pregnancy. The state's interest in maternal health is compelling during the second and third trimesters; the state's interest in potential life is compelling when the fetus is viable, that is, during the third trimester. *Id.* at 162–64, 93 S.Ct. at 731–32.

In dissent in *Hodgson,* the most recent abortion case, Justice Marshall, joined by Justices Brennan and Blackmun, summarized the approach of cases such as *Roe, Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), *Akron,* and *Thornburgh:* "we have subjected state laws limiting [the abortion] right to the most exacting scrutiny, requiring a State to show that such a law is narrowly drawn to serve a compelling interest. Only such strict judicial scrutiny is sufficiently protective of a woman's right to make the intensely personal decision whether to terminate her pregnancy." *Hodgson,* 110 S.Ct. at 2952 (Marshall, J., dissenting) (citations omitted).

#### 2.

■ A statute is struck down under rational basis review only if it is not rationally related to a legitimate state interest. The test is a deferential one, and state legislation is rarely invalidated as not rationally related to a legitimate state interest. *See Williamson v. Lee Optical,* 348

U.S. 483, 487, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955); *Ferguson v. Skrupa,* 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963).

In *Roe,* Justice White and then-Justice Rehnquist dissented and, applying rational basis review, would have upheld Texas' criminal prohibition of abortion. In dissent in *Thornburgh,* Justice White, joined by Justice Rehnquist, stated his reasoning:

State action impinging on individual interests need only be rational to survive scrutiny under the Due Process Clause, and the determination of rationality is to be made with a heavy dose of deference to the policy choices of the legislature. Only "fundamental" rights are entitled to the added protection provided by strict judicial scrutiny of legislation that impinges upon them. I can certainly agree with the proposition—which I deem indisputable—that a woman's ability to choose an abortion is a species of "liberty" that is subject to the general protections of the Due Process Clause. I cannot agree, however, that this liberty is so "fundamental" that restrictions upon it call into play anything more than the most minimal judicial scrutiny.

*Thornburgh,* 476 U.S. at 789–90, 106 S.Ct. at 2193–94 (White, J., dissenting) (citations omitted). In *Webster,* the plurality of Chief Justice Rehnquist, Justice White, and Justice Kennedy asked whether the challenged regulation "permissibly furthers the State's interest in protecting potential human life," *Webster,* 492 U.S. at 519–20, 109 S.Ct. at 3057–58, a standard that, at least for present purposes, we equate with rational basis review. *See also Hodgson,* 110 S.Ct. at 2969 (Kennedy, J., concurring and dissenting) (two-parent notification requirement represents "permissible, reasoned" attempt to further parents' rights).

#### 3.

Justice O'Connor has taken middle ground between these two positions. She has consistently stated that she would subject an abortion regulation to strict scrutiny review *only if* the regulation "unduly burdens" a woman's freedom to decide whether to terminate her pregnancy; oth-

erwise, she would employ rational basis review. *See Akron*, 462 U.S. at 453, 103 S.Ct. at 2504 (O'Connor, J., dissenting) (citation omitted) ("If the particular regulation does not 'unduly burden' the fundamental right, then our evaluation of that regulation is limited to our determination that the regulation rationally relates to a legitimate state purpose."); *Thornburgh*, 476 U.S. at 828, 106 S.Ct. at 2214 (O'Connor, J., dissenting) (repeating undue burden standard and citing dissent from *Akron*); *Webster*, 492 U.S. at 530, 109 S.Ct. at 3063 (O'Connor, J., concurring) (same); *Hodgson*, 110 S.Ct. at 2949–50 (O'Connor, J., concurring) (same).

Justice O'Connor has adopted the undue burden standard because of the "limited nature of the fundamental right that has been recognized in the abortion cases." *Akron*, 462 U.S. at 465 n. 10, 103 S.Ct. at 2511 n. 10 (O'Connor, J., dissenting). In support of her position, she has referenced both previous abortion cases and other fundamental rights cases.[3]

With respect to the concept of "undue burden," Justice O'Connor explained in *Akron* that an undue burden occurs when a regulation imposes an "absolute obstacle[ ] or severe limitation[ ] on the abortion decision," not merely when a regulation "may 'inhibit' abortions to some degree." *Akron*, 462 U.S. at 464, 103 S.Ct. at 2510 (O'Connor, J., dissenting). She repeated this definition in other cases. In *Thornburgh*, she stated that "an undue burden will generally be found in situations involving absolute obstacles or severe limitations on the abortion decision." *Thornburgh*, 476 U.S. at 828, 106 S.Ct. at 2214 (O'Connor, J., dissenting). And in *Hodgson*, she observed that "the 'primary constitutional deficiency lies in [the notification statute's] imposition of an *absolute limitation* on the minor's right to obtain an abortion.'" *Hodgson*, 110 S.Ct. at 2950–51 (O'Connor, J., concurring) (emphasis added) (quoting *Planned Parenthood v. Danforth*, 428 U.S. 52, 90, 96 S.Ct. 2831, 2850, 49 L.Ed.2d 788 (1976)). Also in *Hodgson*, Justice O'Connor approved the judicial

---

**3.** In the abortion context, the pedigree of the undue burden standard can be traced to Justice Powell's opinion for the majority in *Maher v. Roe*, a government funding case:

> *Roe* did not declare an unqualified "constitutional right to an abortion," as the District Court seemed to think. Rather, the right protects the woman from *unduly burdensome* interference with her freedom to decide whether to terminate her pregnancy. It implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion.

*Maher v. Roe*, 432 U.S. 464, 473–74, 97 S.Ct. 2376, 2382–83, 53 L.Ed.2d 484 (1977) (emphasis added). Chief Justice Burger added, "The Court's holdings in [*Roe* and *Doe v. Bolton*] simply require that a State not create an *absolute barrier* to a woman's decision to have an abortion." *Id.* 432 U.S. at 481, 97 S.Ct. at 2386 (Burger, C.J., concurring) (emphasis added). In a later funding case, Justice Stewart stated for the Court that *Roe* protects the woman from "unduly burdensome interference," such as the "severe criminal sanctions" in *Roe* or the "absolute requirement of spousal consent" in *Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). *Harris v. McRae*, 448 U.S. 297, 314, 100 S.Ct. 2671, 2686, 65 L.Ed.2d 784 (1980). Though *Maher* and *Harris* involved funding and thus presented a somewhat different analytical problem than general regulation of abortion, Justice O'Connor has in-

terpreted those cases as providing the correct standard of review for all abortion regulations. *Thornburgh*, 476 U.S. at 828, 106 S.Ct. at 2214 (O'Connor, J., dissenting) ("These principles for evaluating state regulation of abortion were not newly minted in my dissenting opinion in *Akron*."). Justice O'Connor has also pointed out that the results reached in *Danforth* and *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) ("*Bellotti II*"), the most important non-funding cases between *Roe* and *Akron*, are consistent with the undue burden approach. *See Akron*, 462 U.S. at 461–62 n. 8, 464, 103 S.Ct. at 2508–10 n. 8, 2511 (O'Connor, J., dissenting). Beyond the abortion context, Justice O'Connor has pointed to other fundamental rights cases where the Court has required a significant or substantial infringement on the fundamental right in order to trigger strict scrutiny. *See, e.g., Carey v. Population Services International*, 431 U.S. 678, 689, 97 S.Ct. 2010, 2018, 52 L.Ed.2d 675 (1977) (addressing state ban on nonmedical contraceptives, Court stated that strict scrutiny is appropriate only when law imposes "significant burden" on protected right); *Zablocki v. Redhail*, 434 U.S. 374, 387, 98 S.Ct. 673, 681, 54 L.Ed.2d 618 (1978) (heightened scrutiny is appropriate when law interferes "directly and substantially with the right to marry" and "citizens suffer a serious intrusion into their freedom of choice in an area in which we have held such freedom to be fundamental.").

bypass procedure for the two-parent notification requirement on the grounds that it "would not impose parental approval as an *absolute condition* upon the minor's right." *Id.* 110 S.Ct. at 2951 (quoting *Danforth,* 428 U.S. at 91, 96 S.Ct. at 2851) (emphasis added).[4]

### B.

Having identified the three approaches that the Justices have suggested for reviewing abortion regulations, we must now decide which standard is presently the law of the land. As we have noted, the Court applied strict scrutiny review in *Roe, Doe, Akron* and *Thornburgh.* We thus must review *Webster* and *Hodgson* to determine if the standard of review used in those cases displaced strict scrutiny as the standard binding on lower courts. In making that determination, we will apply several principles of law that constrain lower courts in their decisionmaking.

### 1.

■ Decisions of the Supreme Court regarding federal law and the Constitution are binding on the lower courts. There is no room in our system for departure from this principle, for if it were otherwise, the law of the land would quickly lose its coherence. *See Hutto v. Davis,* 454 U.S. 370,

375, 102 S.Ct. 703, 706, 70 L.Ed.2d 556 (1982). The Supreme Court with its limited docket would become irrelevant in all but the handful of cases that reached it.

To say that such decisions are binding, however, does not suffice in the current context. We must determine what components of a Supreme Court decision constitute precedent binding on lower courts. In constitutional cases, the Court's opinions usually include two major aspects. First, the Court provides the legal standard or test that is applicable to laws implicating a particular constitutional provision. This is part of the reasoning of the decision, the *ratio decidendi.*[5] Second, the Court applies that standard or test to the particular facts of the case that the Court is confronting—in other words, it reaches a specific result using the standard or test. *See, e.g., Barnes v. Glen Theatre, Inc.,* —— U.S. ——, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (applying four-part *O'Brien* test and holding ban on nude dancing constitutional); *Employment Division, Dept. of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (applying new Free Exercise Clause standard to uphold state ban on peyote use).

■ As a lower court, we are bound by both the Supreme Court's choice of legal standard or test and by the result it reach-

---

**4.** As we read Justice O'Connor's explications of the concept of "undue burden," they are all consistent with the view that the right to elect not to carry to term is a constitutional right of each individual woman. Where it is clear that a governmental regulation will restrict the ability of *some* women to choose an abortion, we believe the issue of whether there is an undue burden turns on the degree of restriction that the affected women will experience. Accordingly, whether the adversely affected group is but a small fraction of the universe of pregnant women desiring an abortion seems to us irrelevant to that issue.

**5.** For almost every constitutional provision in the Bill of Rights and the Fourteenth Amendment, the Supreme Court has adopted a standard or test, usually known afterwards by the name of the case adopting it, to flesh out the constitutional language and guide future resolution of cases that arise under those provisions. A brief and inexhaustive list includes: *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), for the Establishment

Clause; *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), for libel; *Employment Division, Dept. of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), for Free Exercise claims; *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), for threatening speech; *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), for First Amendment expressive conduct; *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), for drug testing; *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), for state affirmative action; *Metro Broadcasting, Inc. v. FCC,* —— U.S. ——, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) for federal affirmative action; *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), for procedural due process; *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and now *Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), for double jeopardy.

es under that standard or test. As Justice Kennedy has stated, courts are bound to adhere not only to results of cases, but also "to their explications of the governing rules of law." *County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 668, 109 S.Ct. 3086, 3141, 106 L.Ed.2d 472 (1989) (Kennedy, J., dissenting); *see also Marks v. United States*, 430 U.S. 188, 194, 97 S.Ct. 990, 994, 51 L.Ed.2d 260 (1977) (previous case provided "governing standards"). Our system of precedent or *stare decisis* is thus based on adherence to both the reasoning and result of a case, and not simply to the result alone. This distinguishes the American system of precedent, sometimes called "rule stare decisis," from the English system, which historically has been limited to following the results or disposition based on the facts of a case and thus referred to as "result stare decisis." *See* Note, *The Precedential Value of Supreme Court Plurality Decisions*, 80 Colum.L.Rev. 756, 757 n. 7 (1980) ("The American system of precedent places substantially greater reliance on the reasoning component of judicial decisions than, for example, the British system, where the House of Lords issues individual opinions with the understanding that only the specific result will have precedential force."); *see generally* R. Aldisert, *The Judicial Process* 618–35, 777–801 (1976).[6]

### 2.

■ Like lower courts, the Supreme Court applies principles of *stare decisis* and recognizes an obligation to respect both the standard announced and the result reached in its prior cases. Unlike lower courts, the Supreme Court is free to change the standard or result from one of its earlier cases when it finds it to be "unsound in principle [or] unworkable in

practice." *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 546, 105 S.Ct. 1005, 1015, 83 L.Ed.2d 1016 (1985). Accordingly, when a majority of the Justices announce in the course of deciding a case that they are substituting a new standard or result for that used in a prior case, the substitution is effected, and the lower courts are thereafter bound to follow the new standard or result. *See, e.g., Employment Division, Dept. of Human Resources v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); *Vandiver v. Hardin County Board of Education*, 925 F.2d 927 (6th Cir.1991) (applying new *Smith* test).

■ Occasionally, the Supreme Court's decision in a case reveals that a standard established in an earlier case no longer commands the allegiance of a majority of the Justices, but also reveals that no single substitute is endorsed by that majority of the Justices. Thereafter, the lower courts must determine whether to apply the old standard or, if not, what standard to apply. Fortunately, the Supreme Court has instructed the lower courts on how to resolve these issues.

*Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), was a criminal prosecution under a statute barring the interstate transportation of obscene materials. The Court had previously established that the statute was to be interpreted in accordance with the definition of obscenity fashioned by the Supreme Court under the Free Speech Clause of the First Amendment. In response to a contention based on the Ex Post Facto Clause, the Supreme Court in *Marks* had to determine what the law of the land regarding obscenity had been at the time of the defendant's alleged offense. It therefore reviewed its more recent obscenity jurisprudence. In

---

**6.** The lower courts in constitutional matters universally follow both the Supreme Court's choice of legal standard and the specific results the Court has reached by applying that legal standard. *See, e.g., Reuber v. Food Chemical News, Inc.*, 925 F.2d 703, 714–18 (4th Cir.1991) (applying *New York Times* actual malice standard in defamation case); *Vandiver v. Hardin County Board of Education*, 925 F.2d 927, 931–34 (6th Cir.1991) (applying *Smith* Free Exercise Clause

standard); *United States v. Pungitore*, 910 F.2d 1084, 1109–1112 (3d Cir.1990) (applying *Grady v. Corbin* double jeopardy test); *United States v. Cruz*, 910 F.2d 1072, 1078–79 (3d Cir.1990) (applying *Duckworth v. Eagan*, 492 U.S. 195, 109 S.Ct. 2875, 106 L.Ed.2d 166, test for adequacy of *Miranda* warnings); *United States v. American Investors of Pittsburgh, Inc.*, 879 F.2d 1087, 1106–07 (3d Cir.1989) (applying *Leon* standard for defective search warrants).

*Roth v. United States*, 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1957), the Court had declared the test to be "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to the prurient interest." Some years later in *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), a plurality opinion joined only by three Justices announced that a work is not obscene unless "three elements ... coalesce:"

> [I]t must be established that (a) the dominant theme of the material taken as a whole appears to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value.

383 U.S. at 418, 86 S.Ct. at 977. The plurality opinion in *Memoirs* decided that *Fanny Hill* was not obscene when judged by this standard and, accordingly, that the defendants' conviction had to be overturned. Three additional Justices concurred in this result but did so utilizing different rules of law: two stated that the First Amendment shields all speech including obscenity; one stated that the First Amendment protects all but "hard core pornography." Three Justices dissented.

The *Marks* Court was required to determine whether the legal standard announced in *Roth* had remained the law of the land after *Memoirs* or whether it had been superseded by a new standard in *Memoirs*. Despite the fact that no new legal standard had commanded the allegiance of a majority of the Justices in *Memoirs*, the *Marks* Court held that *Roth*'s standard did not survive *Memoirs* because a majority of Justices in *Memoirs* rejected the *Roth* standard. *Marks* thus stands for a very important proposition: a legal standard endorsed by the Court ceases to be the law of the land when a majority of the Court in a subsequent case declines to apply it, even if that majority is composed of Justices who disagree on what the proper standard should be.

Having decided that the *Roth* standard had ceased to control, the *Marks* Court also determined what standard had taken its place. The Court concluded that the *Memoirs* plurality opinion had become the law of the land. The court explained that "[w]hen a fragmented court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks*, 430 U.S. at 193, 97 S.Ct. at 993 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). The Justices in the plurality in *Memoirs* were those who concurred on the narrowest grounds.

■ Thus, *Marks* stands for a second important proposition: the controlling opinion in a splintered decision is that of the Justice or Justices who concur on the "narrowest grounds." The principal objective of this *Marks* rule is to promote predictability in the law by ensuring lower court adherence to Supreme Court precedent. This objective requires that, whenever possible, there be a single legal standard for the lower courts to apply in similar cases and that this standard, when properly applied, produce results with which a majority of the Justices in the case articulating the standard would agree. In a run-of-the-mill case where a majority of the Justices endorse a single legal standard, *see, e.g., Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), lower courts simply follow that standard. In splintered decisions such as *Memoirs* where no single rationale "enjoys the assent of five Justices," the situation becomes more complex, but the controlling principle is the same. Where a Justice or Justices concurring in the judgment in such a case articulates a legal standard which, when applied, will necessarily produce results with which a majority of the Court from that case would agree, that standard is the law of the land. In a constitutional case where (1) there is a 5–4 decision or where there are only two opinions in the

majority and (2) the majority votes to uphold a law as constitutional, the "narrowest grounds" principle will identify as authoritative the standard articulated by a Justice or Justices that would uphold the fewest laws as constitutional. Conversely, in a constitutional case where (1) there is a 5–4 split or there are only two opinions in the majority and (2) the majority strikes down a law as unconstitutional, the authoritative standard will be that which would invalidate the fewest laws as unconstitutional.[7]

In splintered Supreme Court decisions where there has been a common denominator standard that would necessarily produce results with which a majority of the Justices from the controlling case would agree, the Supreme Court and the lower courts have consistently identified as binding precedent the opinion setting forth that standard. *See Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976) (identifying three-Justice plurality opinion from *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), as binding); *S.J. Groves & Sons Co. v. Fulton County*, 920 F.2d 752 (11th Cir.1991) (following Chief Justice Burger's opinion from *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980)); *Lundblad v. Celeste*, 874 F.2d 1097 (6th Cir.1989) (following Justice Stewart's opinion in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)); *Stegmaier v. Trammell*, 597 F.2d 1027 (5th Cir.1979) (same); *Islamic Center of Mississippi, Inc. v. City of Starksville*, 876 F.2d 465 (5th Cir.1989) (following Justice O'Connor's opinion in *Pennsylvania v. Delaware Valley Citizens Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) ("*Delaware Valley II*");

*Student Public Interest Research Group of New Jersey, Inc. v. AT & T Bell Laboratories*, 842 F.2d 1436 (3d Cir.1988) (same).[8]

■ The binding opinion from a splintered decision is as authoritative for lower courts as a nine-Justice opinion. While the opinion's symbolic and perceived authority, as well as its duration, may be less, that makes no difference for a lower court. This is true even if only one Justice issues the binding opinion. In *Blum v. Witco Chemical Corp.*, 888 F.2d 975, 981 (3d Cir. 1989), for example, we concluded, as has every other court of appeals to address the issue, that Justice O'Connor's concurring opinion in *Delaware Valley II* governed subsequent counsel fee cases even though no other Justice joined that opinion. We acknowledged that, "[a]lthough there is some awkwardness in attributing precedential value to an opinion of one Supreme Court justice to which no other justice adhered, it is the usual practice when that is the determinative opinion." *Blum*, 888 F.2d at 981.

In sum, the effect of following the wrong opinion from a splintered decision is the same as affirmatively declaring that a Supreme Court majority opinion is not binding. By following the opinion that comports with the *Marks* principle, we respect the decision of a majority of the Court and thus fulfill our obligation to comply with decisions of the Supreme Court.

### 3.

■ With this background, we turn to the Supreme Court's abortion jurisprudence to determine whether the strict scrutiny legal standard endorsed by the Court in *Roe*, *Akron*, and *Thornburgh* remains

---

**7.** When six or more Justices join in the judgment and they issue three or more opinions, the situation is slightly more complex. In those cases, the idea is to locate the opinion of the Justice or Justices who concurred on the narrowest grounds *necessary to secure a majority*. In other words, a lower court should not follow an opinion that, though part of the majority in that case, was unnecessary to secure a five-Justice majority. Thus, if three Justices issue the broadest opinion, two Justices concur on narrower grounds, and one Justice concurs on still-narrower grounds, the two-Justice opinion

is binding because that was the narrowest of the opinions necessary to secure a majority.

**8.** In rare cases, no common denominator exists beyond agreement on the result in that particular case. *See United States v. Eckford*, 910 F.2d 216 (5th Cir.1990) (finding no common denominator and thus no binding opinion in *Baldasar v. United States*, 446 U.S. 222, 100 S.Ct. 1585, 64 L.Ed.2d 169 (1980)); *Schindler v. Clerk of Circuit Court*, 715 F.2d 341 (7th Cir.1983) (same).

the applicable standard after *Webster* and *Hodgson.* The primary issue in *Webster* was the constitutionality of Missouri's viability testing provision. The five Justices in the majority issued three opinions in upholding that viability testing provision. Chief Justice Rehnquist's opinion, joined by Justices White and Kennedy, upheld the provision under the "permissibly furthers" standard, the equivalent of rational basis review. Justice Scalia concurred, similarly rejecting strict scrutiny review of abortion regulations and arguing that *Roe* should be explicitly overruled. The four Justices in dissent would have applied the traditional strict scrutiny test.[9]

In her concurring opinion, Justice O'Connor used the undue burden standard that she had articulated in past dissents. She

concluded that Missouri's viability testing requirement was constitutional because it did not impose an undue burden on a woman's abortion decision and was rationally related to a legitimate state interest. She stated:

> It is clear to me that requiring the performance of examinations and tests useful to determining whether a fetus is viable, when viability is possible, and when it would not be medically imprudent to do so, does not impose an undue burden on a woman's abortion decision. *On this ground alone* I would reject the suggestion that § 188.029 as interpreted is unconstitutional.

*Webster,* 492 U.S. at 530, 109 S.Ct. at 3063 (O'Connor, J., concurring) (emphasis added).[10]

---

**9.** Four Justices dissented over the interpretation of the Missouri statute. The dissenters agreed, however, that the statute as interpreted by the majority survived strict scrutiny review. Thus, all nine members of the Court concluded that the statute as interpreted by the majority was constitutional, but for four different reasons. In any event, five Justices rejected strict scrutiny, and the narrowest opinion of those five Justices was that of Justice O'Connor.

**10.** Although Justice O'Connor's discussion in *Webster* did not end with her analysis under the undue burden standard, it did rely on and adhere to her undue burden approach for abortion regulations. Interpreting Justice O'Connor's opinion as agreeing with the *Akron* strict scrutiny standard for reviewing all abortion regulations would not only be inconsistent with that portion of her opinion that we have quoted in the text, but would also be plainly incompatible with her consistent approach in cases before and after *Webster:* that the undue burden approach is the proper analysis for review of abortion regulations.

We note that Justice O'Connor *herself* has subsequently interpreted her opinion in *Webster* as relying on the undue burden standard. In *Hodgson,* she again put forth the undue burden approach as the proper standard for abortion cases. In doing so, she cited her opinion in *Webster* in support of her understanding that if a regulation does not unduly burden the fundamental right, "then our evaluation is limited to our determination that the regulation rationally relates to a legitimate state purpose." *Hodgson,* 110 S.Ct. at 2949–50 (O'Connor, J., concurring).

Moreover, in addition to Justice O'Connor, her colleague read her opinion as we do. Justice Scalia in concurrence in *Webster* interpreted Justice O'Connor's opinion to rely on the undue burden standard in upholding the viabili-

ty testing provision. He stated: "Justice O'Connor would nevertheless uphold the law because 'it does not impose an undue burden on a woman's abortion decision.'" *Webster,* 492 U.S. at 536 n. *, 109 S.Ct. at 3066 n. * (Scalia, J., concurring).

To understand Justice O'Connor's further discussion in *Webster,* it is necessary to remember that the trimester framework establishes what types of abortion regulations meet the strict scrutiny standard. Under the trimester framework, the state's interest in maternal health is compelling only in the second and third trimesters, and the state's interest in the fetus is compelling only in the third trimester. The plurality in *Webster* found that the viability testing provision was in conflict with the trimester framework. But the plurality upheld the provision after discarding the trimester framework as "unsound in principle and unworkable in practice." Justice O'Connor stated that she continued to have problems with the trimester framework, but she saw no need in *Webster* to address the serious constitutional question raised by its reconsideration. In effect, Justice O'Connor's opinion, after stating why she believed the viability testing provision was constitutional, agreed with the dissent that the plurality was reaching out unnecessarily in addressing the trimester framework.

She gave two reasons why the viability testing provision did not implicate the trimester framework. First, under her approach, it did not cause an undue burden and therefore strict scrutiny and the trimester framework derived from it were simply not applicable. Second, even if the provision triggered strict scrutiny, thus implicating the trimester framework, the Court had always held—consistent with the trimester framework—that the state has a compelling interest in determining the critical point of

*Hodgson* was decided in a similar manner. There the Court addressed the constitutionality of a two-parent notification requirement without a judicial bypass option and a two-parent notification requirement with a judicial bypass option. Five Justices—Justices O'Connor, Brennan, Marshall, Blackmun, and Stevens—held that a two-parent notification statute without a judicial bypass procedure was unconstitutional. Justice O'Connor found that the regulation caused an undue burden and failed to survive strict scrutiny review. She articulated the standard as follows:

> It has been my understanding in this area that "[i]f the particular regulation does not 'unduly burde[n]' the fundamental right, . . . then our evaluation of that regulation is limited to our determination that the regulation rationally relates to·a legitimate state purpose." *Akron v. Akron Center for Reproductive Health,* 462 U.S. 416, 453 [103 S.Ct. 2481, 2511, 76 L.Ed.2d 687] (1983) (O'Connor, J., dissenting); see also *Webster v. Reproductive Health Services,* 492 U.S. 490, 522–23, 109 S.Ct. 3040, 3059, 106 L.Ed.2d 410 (1989) (O'Connor, J., concurring in part and concurring in judgment). . . . I agree with Justice Stevens that Minnesota has offered no sufficient justification for its interference with the family's decisionmaking processes created by subdivision 2—two-parent notification.

*Hodgson,* 110 S.Ct. at 2949–50 (O'Connor, J., concurring). Three of the other four Justices in the majority applied strict scrutiny review without determining as a threshold matter whether the regulation caused an undue burden. Justice Stevens agreed that the statute was unconstitutional, noting that "[u]nder any analysis, the Minnesota statute cannot be sustained if the obstacles it imposes are not reasonably related to legitimate state interests." *Id.* at 2937 (opinion of Stevens, J.). He con-

cluded both that the state had no legitimate interest in assuring that a particular individual parent participate in the child's abortion decision and that requiring the minor to notify both parents did not further the state's interest in seeing that a minor's abortion decision be informed. *Id.* at 2937, 2945. The four dissenters would have applied rational basis review and upheld the provision.

Also in *Hodgson,* five Justices—Justice O'Connor, Chief Justice Rehnquist, and Justices White, Scalia, and Kennedy—held that a two-parent notification requirement with a judicial bypass option was constitutional. Justice O'Connor concluded that it did not cause an undue burden and passed rational basis review:

> In a series of cases, this Court has explicitly approved judicial bypass as a means of tailoring a parental consent provision so as to avoid *unduly burdening* the minor's limited right to obtain an abortion. In *Danforth,* the Court stated that the
>
>> "primary constitutional deficiency lies in [the notification statute's] imposition of an *absolute limitation* on the minor's right to obtain an abortion. . . ."
>
> Subdivision 6 passes constitutional muster because the interference with the internal operation of the family required by subdivision 2 simply does not exist where the minor can avoid notifying one or both parents by use of the bypass procedure.

*Hodgson,* 110 S.Ct. at 2950–51 (O'Connor, J., concurring) (emphasis added) (citations omitted). The other four Justices in the majority on this issue in *Hodgson* found that the statute passed rational basis review without first deciding if it caused an undue burden. The dissenters would have used strict scrutiny and struck down the provision.

viability. In sum, according to Justice O'Connor, the trimester framework was neither triggered by nor inconsistent with the viability testing provision.

For our purposes, the most important point about Justice O'Connor's opinion in *Webster* is the following: in arguing that strict scrutiny

was not triggered and thus that the trimester framework should not have been reconsidered, Justice O'Connor in no way retreated from, and indeed she affirmatively relied on, her consistent view that a threshold undue burden determination is necessary before strict scrutiny is to be employed.

Justice O'Connor thus concurred in *Webster* and on one issue in *Hodgson* by holding that an abortion regulation that imposes no undue burden on a woman's decision to have an abortion does not violate the Due Process Clause so long as it is rationally related to a legitimate state interest. While the views of the other Justices concurring in the judgment on those issues differed from those of Justice O'Connor, all of them would uphold as constitutional any regulation meeting that standard.

Moreover, Justice O'Connor concurred in the Court's judgment on the other issue in *Hodgson* on the ground that an abortion regulation that imposes an undue burden on the decision to abort violates the Due Process Clause if does not meet the strict scrutiny standard. Here also, the other Justices concurring in the judgment on this issue did not join her opinion, but they would strike down as unconstitutional any regulations struck down under the undue burden standard.

In these circumstances, we conclude that it would be inconsistent with the teachings of *Marks* for lower courts to apply the strict scrutiny test of *Roe, Akron,* and *Thornburgh* to all abortion regulations. We also conclude that only by applying the undue burden standard of review, that is, only by applying strict scrutiny review to regulations that impose an undue burden and rational basis review to those which do not, can we remain faithful to *Marks*. Only by following the rationale of Justice O'Connor's concurring opinions will the lower courts decide abortion regulation cases in a way consistent with the way the Court decided them in *Webster* and *Hodgson*.

### 4.

Having concluded that the undue burden standard is binding on us, one issue of *stare decisis* remains: Are we required to follow *results* reached by the Supreme Court in cases prior to *Webster* and *Hodg-*

son even though we are not bound by the rationale which produced those results? In the instant case, this issue is relevant because the Supreme Court, engaging in strict scrutiny review in *Akron* and *Thornburgh,* struck down informed consent provisions almost identical to the provisions at issue here. If we were constrained to follow the *results* reached in *Akron* and *Thornburgh,* we would hold unconstitutional the informed consent provisions of the Pennsylvania Act. We are convinced, however, that such a course would be improper.

It would be anomalous if the results reached under a constitutional standard remained binding after the standard or test was repudiated. To take a variation [11] of a familiar constitutional story, suppose that the Court in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), had required that states no longer run segregated school systems by repudiating the *Plessy* separate but equal doctrine and stating that the Equal Protection Clause forbids invidious racial classifications by government. Although *Brown* of course involved schools, a lower court in the aftermath would apply that principle to all racial classifications by government, regardless of whether before *Brown* the Supreme Court had upheld racial classifications in the particular context at issue. Thus, if pre-*Brown,* the Court had stated that state-segregated public pools did not violate the Equal Protection Clause, a lower court faced with a challenge to state-segregated pools after the *Brown* decision would apply the new principle to pools rather than upholding the segregated pools on the basis of the result reached by the Supreme Court under the discarded standard.

In order to change course in a particular area, it simply is unnecessary for the Supreme Court to go case-by-case through fact patterns that the Court had previously addressed under a repudiated standard. If the standard is replaced, decisions reached under the old standard are

**11.** We say variation because the Court in *Brown* actually seemed to rest its decision on the context—schools—rather than a blanket principle

about the Equal Protection Clause. For our example here, we will assume that the latter had occurred.

not binding.[12] We thus conclude that a change in the legal test or standard governing a particular area is a change binding on lower courts that makes results reached under a repudiated legal standard no longer binding.[13]

In sum, Justice O'Connor's undue burden standard is the law of the land, and we will apply that standard to all provisions of the Pennsylvania Act at issue in this appeal.

### III.

An abortion regulation can infringe upon the abortion right in at least seven ways: (1) causing a delay before the abortion is performed; (2) raising the monetary cost of an abortion; (3) reducing the availability of an abortion by directly or indirectly causing a decrease in the number of legal abortion providers; (4) causing or forcing the woman to receive information she has not sought; (5) causing the woman to find the person or persons whom the state has required that she notify or obtain consent from; (6) causing the woman to endure any negative or hostile response from a person whom the state has required the woman to notify or obtain consent from; and (7) taking away the power to decide whether to have an abortion by giving another person,

usually a parent or spouse, a veto power on the abortion decision. Almost all abortion regulations implicate the first three of these; informed consent requirements also involve the fourth; and notice and consent statutes also implicate the fifth, sixth, and seventh.

 A review of the abortion case law, and *Webster* and *Hodgson* in particular, suggest that no undue burden is caused by abortion regulations that do not have a "severe" or "drastic" impact upon time, cost, or the number of legal providers of abortions. *Webster*, 492 U.S. at 529–30, 109 S.Ct. at 3062–63 (O'Connor, J., concurring); *Thornburgh*, 476 U.S. at 827–33, 106 S.Ct. at 2213–16 (O'Connor, J., dissenting); *Akron*, 462 U.S. at 464–67, 472–74, 103 S.Ct. at 2510–12, 2515–16 (O'Connor, J., dissenting). Similarly, the case law indicates that a state's requirement that abortion providers communicate information to a woman, which is typically in the form of an informed consent requirement, will not constitute an undue burden if the information that the abortion provider must give is relevant, accurate, and non-inflammatory. *Thornburgh*, 476 U.S. at 830–32, 106 S.Ct. at 2215–16 (O'Connor, J., dissenting).[14]

**12.** While results reached under a discarded standard are no longer binding, that does not mean that the old results are necessarily wrong; it simply means that the fact patterns producing those results must be analyzed under the new standard. That is why, though we conclude that the strict scrutiny standard applied in *Akron* and *Thornburgh* is no longer governing and the results no longer binding, the provisions held unconstitutional there are not necessarily constitutional; we must instead analyze the provisions under the newly minted undue burden standard.

**13.** We are of course mindful that only the Supreme Court "may overrule one of its precedents." *Thurston Motor Lines v. Jordan K. Rand Ltd.*, 460 U.S. 533, 535, 103 S.Ct. 1343, 1344, 75 L.Ed.2d 260 (1983); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). The Court rejected anticipatory overruling in *Rodriguez.* A lower court may not disregard a result reached under a controlling standard, even when that result is inconsistent with other results reached under the same standard. Similarly, a lower court may not reject a governing standard unless a majority of the Justices in a single case declines to apply it. Thus, while a

regulation must constitute an undue burden to trigger strict scrutiny, the trimester framework is still binding when strict scrutiny is triggered. Although five sitting Justices of the Supreme Court have criticized or rejected the *Roe* trimester framework, they have not rejected it in a single case. *Cf. Sojourner v. Roemer*, 772 F.Supp. 930 (E.D.La.1991) (invalidating criminal prohibition on abortion).

**14.** We have held that the undue burden standard adopted by Justice O'Connor in *Webster* and *Hodgson* is the binding standard. The definition of that standard—"absolute obstacle or severe limitation"—used by Justice O'Connor in those cases is binding, as is her application of that standard to the viability testing provision and two-parent notification provision. However, her application of that standard in past dissents—the results she would have reached in those cases—is not binding on us. Nonetheless, we will often refer to her application of the undue burden standard in past dissents as evidence (though not conclusive) of how the undue burden standard might apply here. As we stated earlier, lower courts cannot read the tea leaves in overruling precedent, but lower courts can do so with respect to open issues or new

■ The primary manner in which an abortion regulation can constitute an undue burden, other than by banning some or all previability abortions, is by taking away the woman's unilateral power to decide whether to have a previability abortion. Thus, a regulation in which the state gives a veto power to the woman's husband or, for a minor woman, to a parent constitutes an undue burden. *See Hodgson,* 110 S.Ct. at 2949–50 (O'Connor, J., concurring); *Akron,* 462 U.S. at 464, 103 S.Ct. at 2510 (O'Connor, J., dissenting); *Bellotti II,* 443 U.S. at 646–48, 99 S.Ct. at 3049–51; *Danforth,* 428 U.S. at 67–72, 96 S.Ct. at 2840–43. However, a parental consent or notice provision combined with an adequate judicial bypass procedure does not constitute an undue burden. *See Hodgson,* 110 S.Ct. at 2950–51 (O'Connor, J., concurring).

■ With this overall orientation, we turn now to the individual provisions of the Act. We may overrule the district court's factual findings based on the evidence before it only when clearly erroneous. We exercise plenary review, however, over the district court's determination of constitutionality and thus over whether the facts found regarding the effect of a particular statutory provision constitute an "undue burden." We also exercise plenary review over the question whether a provision passes strict scrutiny or rational basis review.

A. *The Medical Emergency Exception*

We first address an issue that would affect virtually all of our later analysis if not resolved at the outset. Section 3203 of the Act defines the term medical emergency. A medical emergency is:

> that condition which, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate termination of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of major bodily function.

18 Pa. Cons.Stat.Ann. § 3203 (1983 & Supp. 1991). When a medical emergency exists, the Act permits doctors and women to forego a number of the Act's requirements, including the waiting period, parental consent, and spousal notice requirements. The district court declared the definition in § 3203 unconstitutionally narrow and struck down all provisions of the Act that contained this medical emergency exception; for certain provisions, this was only an alternative basis for the district court's holding of unconstitutionality.

■ The Supreme Court indicated in *Roe* and subsequent cases that the state's interest in the fetus is not sufficient to prevent a woman: (1) from having a previability abortion; or (2) from having an abortion at any point during the pregnancy, immediately if necessary, to prevent a serious threat to her life or health. In *Roe,* the Court stated that third trimester abortions may be banned except where "necessary to preserve the life *or health* of the mother." 410 U.S. at 164, 93 S.Ct. at 732 (emphasis added); *see also Harris v. McRae,* 448 U.S. 297, 316, 100 S.Ct. 2671, 2687, 65 L.Ed.2d 784 (1980) ("it could be argued that the freedom of a woman to decide whether to terminate her pregnancy for health reasons does in fact lie at the core of the constitutional liberty identified in [*Roe* ]."). From *Roe* and subsequent cases, it thus appears that any abortion regulation which might delay or prevent an abortion must contain a medical emergency exception.

■ The Commonwealth does not dispute that its abortion regulations would be constitutionally deficient if they did not contain an exception for those situations in which compliance would pose a serious risk to the life or health of the woman. The clinics acknowledge that the Act's medical emergency exception is intended to protect the life and health of the woman, but they seek to demonstrate that it is deficient by pointing to three conditions encountered by pregnant women with some frequency: preeclampsia, inevitable abortion, and pre-

---

areas; and that, in effect, is what we confront here, since for most of the provisions involved

in this case, the Court has never applied the undue burden standard.

maturely ruptured membrane. In the clinics' view, these conditions are not covered by the medical emergency exception because each "could pose a serious threat to a woman's health without immediately creating a serious risk of substantial and irreversible impairment to a major bodily function." Brief for Appellees at 16. The clinics insist that this renders the Commonwealth's regulations unconstitutional.

The Commonwealth does not challenge the assertion that its regulations would be unconstitutional if women having preeclampsia, inevitable abortion, or prematurely ruptured membrane were required to satisfy all of the requirements of the Act before having an abortion. Rather, the Commonwealth responds that preeclampsia, inevitable abortion, and prematurely ruptured membrane are "medical emergencies" as defined in the Act because "all of these conditions, if left untreated, could progress to such a point that death or substantial and irreversible impairment of a major bodily function will occur." Reply Brief for Appellants at 4 n. 2.

It is thus apparent that our initial issue for resolution is one of statutory interpretation and is governed by Pennsylvania law. There is no helpful Pennsylvania case law construing the medical emergency provision of the Act. There are, however, Pennsylvania cases indicating that statutes of the Commonwealth should be construed to sustain their constitutionality. *See Commonwealth v. Blystone*, 519 Pa. 450, 549 A.2d 81, 87 (1988) ("Any doubts are to be resolved in favor of sustaining the legislation."); *Hughes v. Commonwealth Dept. of Transportation*, 514 Pa. 300, 523 A.2d 747, 750–51 (1987) ("We must presume that an Act of the legislature is intended to be constitutional and wherever a legislative act can be preserved from unconstitutionality it must be preserved."); *see also Webster*, 492 U.S. at 514, 109 S.Ct. at 3054 (statutes should be interpreted to avoid constitutional difficulty); *Frisby v. Schultz*, 487 U.S. 474, 483, 108 S.Ct. 2495, 2501, 101 L.Ed.2d 420 (1988) (same). With this case law in mind, we turn to the symptoms and the risks of each of the conditions identified by the clinics.

Preeclampsia is a combination of symptoms related to an immunological disorder. When diagnosed as having preeclampsia, "the patient develops hypertension, she can have destruction of the liver, hemorrhage into the liver, she can have destruction of the kidneys and she may go on to have clampsia, which is a seizure disorder of the brain." Trial Testimony of Dr. Bolognese, Witness for the Clinics ("Bolognese Testimony"), App. at 614. Both Dr. Bolognese for the clinics and the doctor who testified for the Commonwealth agreed that preeclampsia requires an abortion. Trial Testimony of Dr. Bowes, Witness for the Commonwealth ("Bowes Testimony"), App. at 889.

The symptoms of inevitable abortion are bleeding from the uterus and cramps in the lower abdominal area. The failure to terminate the pregnancy immediately when this condition exists can lead to extensive blood loss, shock, infection, and, if there is serious hemorrhaging and shock, even death. 744 F.Supp. at 1346–47. The Commonwealth's expert at trial agreed with the clinics' expert that the universally recommended treatment of an inevitable abortion is immediate termination of the pregnancy. Bowes Testimony, App. at 888.

The major risk from a prematurely ruptured membrane is that an infection will occur. If an infection occurs, a woman can be exposed to spread of the infection, an overwhelming septic infection, hemorrhaging, shock, and even death. Bolognese Testimony, App. at 611.

There is no dispute between the parties that preeclampsia, inevitable abortion and prematurely ruptured membrane *can lead to* a substantial and irreversible impairment of a major bodily function. The record is clear that a failure to obtain an abortion when a woman is diagnosed with preeclampsia can lead to irreversible damage to the liver, kidneys and more; that failure to perform an abortion when a woman is diagnosed with inevitable abortion can eventually lead to death; and that a failure to obtain an abortion when a woman is diagnosed with prematurely rup-

tured membrane can eventually lead to death. The dispute between the parties concerns the meaning of the phrase "serious risk." The Commonwealth insists that whenever these conditions exist, there is a "serious risk" of substantial and irreversible impairment of a major bodily function. The clinics argue that no such "serious risk" exists until the woman has actually experienced shock or contracted an infection. We conclude that the clinics' interpretation is unduly restrictive.

The word "risk" necessarily implies an event that may or may not happen in the future. Neither "risk" nor the addition of the adjective "serious" implies that the probability assessed is the probability of the hypothesized event occurring immediately following the time of assessment. Accordingly, we do not believe the risk that prematurely ruptured membrane, if untreated, will lead to substantial and irreversible injury only after progressing through shock or infection necessarily means that there is no "serious risk" at the onset of the condition. We assume that the risk of substantial and irreparable impairment of a major bodily function will be quantitatively less at the onset of a prematurely ruptured membrane than after shock has occurred, but this does not mean the risk at onset is not "serious."

The Pennsylvania legislature did not choose the wording of its medical emergency exception in a vacuum, and we do not believe the words chosen should be interpreted in one. In the case of all three conditions pointed to by the clinics, the treatment uniformly prescribed by the medical profession at the time of the legislature's choice was an immediate abortion. This was the recommended treatment in all pregnancies in which these conditions arose, including planned and desired pregnancies. This medical consensus that the risk occasioned is sufficiently serious to call for an immediate abortion was a part of the context in which the medical emergency provision was fashioned.

■ Moreover, we read the medical emergency exception as intended by the Pennsylvania legislature to assure that compliance with its abortion regulations would not in any way pose a significant threat to the life or health of a woman. We believe it should be interpreted with that objective in mind. While the wording seems to us carefully chosen to prevent negligible risks to life or health or significant risks of only transient health problems from serving as an excuse for noncompliance, we decline to construe "serious" as intended to deny a woman the uniformly recommended treatment for a condition that can lead to death or permanent injury.

The essence of the definition in § 3203 is that it allows a woman and her doctors to forego many of the Act's requirements when there is a medical emergency to the woman's physical health, and that includes where a woman has symptoms of preeclampsia, inevitable abortion, or prematurely ruptured membrane. We interpret § 3203 to allow women and doctors to forego the Act's requirements when a woman is diagnosed as having one of these conditions. If the Commonwealth were to choose, in contradiction to its representations to this court, to prevent doctors and women from foregoing the Act's requirements when a woman has been so diagnosed, that application would almost certainly be unconstitutional under present Supreme Court law.

■ Any doubt on our interpretation of § 3203 is resolved by the procedural posture of the case. This is a facial challenge. The Supreme Court has instructed on numerous occasions that a court is not to strike down a law as unconstitutional on the basis of "a worst-case analysis that may never occur." *Ohio*, 110 S.Ct. at 2981. The Supreme Court recently applied this principle in a very similar context in *Rust v. Sullivan*, — U.S. —, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). There, the regulations at issue did not contain an explicit exception for cases where a woman's pregnancy placed her life in imminent peril, but the Court rejected a facial claim that the regulations would not allow abortion referral in such circumstances. The Court stated that on a facial challenge without "any application by the Secretary to a specific

fact situation," it would not read the regulations to bar referral in such cases. *Id.* 111 S.Ct. at 1773. Similarly presented with a facial challenge, we uphold the medical emergency exception defined in § 3203.

In an alternative challenge, the clinics argue that the medical emergency definition is void for vagueness. The district court did not consider this issue; we do so here and reject it. The Act provides criminal and civil sanctions against doctors who violate the Act's provisions. However, the Act allows doctors and women to forego the Act's requirements when, "on the basis of the physician's good faith clinical judgment," a condition exists that meets the definition of medical emergency in § 3203. The Commonwealth argues that the terms of § 3203 are not vague. They also contend that the subjective standard of "good faith clinical judgment" saves the statute from any problem of vagueness.

In *United States v. Vuitch*, 402 U.S. 62, 69–72, 91 S.Ct. 1294, 1298–99, 28 L.Ed.2d 601 (1971), the Supreme Court upheld against a vagueness challenge a requirement that an abortion be "necessary for the preservation of the mother's life or health." In *Doe v. Bolton*, the Court upheld against a vagueness challenge a requirement that the physician determine, on the basis of his or her "best clinical judgment," that an abortion is "necessary." 410 U.S. at 191–92, 93 S.Ct. at 747–48. In contrast, in *Colautti v. Franklin*, 439 U.S. 379, 390–97, 99 S.Ct. 675, 683–87, 58 L.Ed.2d 596 (1979), the Court struck down on vagueness grounds a requirement that the physician determine if the fetus "is viable" or "may be viable" before performing an abortion. The Court stated that it was unclear whether the Act incorporated a subjective or objective standard. In addi-

tion, the definition of "may be viable" was elusive and did not provide sufficient notice.

In this case, the statute requires a physician to violate his or her own good faith clinical judgment in order to be criminally liable. This is a subjective, not an objective standard, thus making the case more similar to *Vuitch* and *Doe* than to *Colautti*. We fail to see how any physician practicing in good faith could fear conviction under the Act.

Moreover, as we have already concluded, the language of § 3203, apart from the "good faith clinical judgment" language, does not prohibit doctors from foregoing the Act's requirements when what are commonly perceived to be medical emergencies exist. The clinics here came up with three medical emergencies that they argued were not covered by the statute. We have held that they are. Physically threatening emergencies are covered; determining whether, in a physician's good faith clinical judgment, one of those emergencies is present is the type of "judgment[ ] that physicians are obviously called upon to make routinely whenever surgery is considered." *Doe*, 410 U.S. at 192, 93 S.Ct. at 748. Section 3203 provides the fair warning required by the Due Process Clause; it is not void for vagueness.

### B. *The Informed Consent Requirement*

Section 3205(a) contains the informed consent provisions of the Act. Three aspects of that section are at issue in this appeal: two information disclosure requirements and a requirement that the woman wait 24 hours between the time she receives this information and the time the abortion is performed.[15] We address these provisions in turn.

---

**15.** Section 3205 of the Act states in relevant part:

(a) GENERAL RULE.—No abortion shall be performed or induced except with the voluntary and informed consent of the woman upon whom the abortion is to be performed or induced. Except in the case of a medical emergency, consent to an abortion is voluntary and informed if and only if:

(1) At least 24 hours prior to the abortion, the physician who is to perform the abortion or the referring physician has orally informed the woman of:

(i) The nature of the proposed procedure or treatment and of those risks and alternatives to the procedure or treatment that a reasonable patient would consider material to the decision of whether or not to undergo the abortion.

## 1. Physician–Disclosed Information

■ Section 3205(a)(1) requires that the referring or performing physician inform a woman contemplating an abortion of: (i) the nature of the abortion procedure and of those risks and alternatives to the procedure or treatment that a reasonable patient would consider material to the decision whether or not to obtain an abortion; (ii) the probable gestational age of the fetus; and (iii) the medical risks associated with carrying a child to term. Such a provision can be expected to cause four types of burdens: time delay, higher cost, reduced availability, and forcing the woman to receive information she has not sought. We conclude, however, that none of these potential burdens can be characterized as an undue burden.

The time required to provide medical risk information of this kind is acknowledged to be insignificant. While the district court found that higher costs would be occasioned by § 3205(a)(1)'s requirement that physicians rather than counselors provide this information, the district court did not quantify the increase, and this record would not support a finding of an increase of sufficient size to constitute an absolute obstacle or severe limitation on the abortion right. *See Webster,* 492 U.S. at 530, 109 S.Ct. at 3063 (O'Connor, J., concurring); *Akron,* 462 U.S. at 467, 473, 103 S.Ct. at 2512, 2516 (O'Connor, J., dissenting). Similarly, this requirement will not cause abortion providers to stop providing any or all abortions and, accordingly, will not cause a drastic or severe reduction in the availability of abortion. Finally, the information provided is accurate and necessary for a woman to make an assessment for her abortion decision. Indeed, the record shows that the clinics, without exception, insist on providing this information to women before an abortion is performed. Thus, the "burden" of forcing a woman to listen

(ii) The probable gestational age of the unborn child at the time the abortion is to be performed.

(iii) The medical risks associated with carrying her child to term.

(2) At least 24 hours prior to the abortion, the physician who is to perform the abortion or the referring physician, or a qualified physician assistant, health care practitioner, technician or social worker to whom the responsibility has been delegated by either physician, has informed the pregnant woman that:

(i) The department [Pennsylvania Department of Health] publishes printed materials which describe the unborn child and list agencies which offer alternatives to abortion and that she has a right to review the printed materials and that a copy will be provided to her free of charge if she chooses to review it.

(ii) Medical assistance benefits may be available for prenatal care, childbirth and neonatal care, and that more detailed information on the availability of such assistance is contained in the printed materials published by the department.

(iii) The father of the unborn child is liable to assist in the support of her child, even in instances where he has offered to pay for the abortion. In the case of rape, this information may be omitted.

(3) A copy of the printed materials has been provided to the woman if she chooses to view these materials.

(4) The pregnant woman certifies in writing, prior to the abortion, that the information required to be provided under paragraphs (1), (2) and (3) has been provided.

(b) EMERGENCY.—Where a medical emergency compels the performance of an abortion, the physician shall inform the woman, prior to the abortion if possible, of the medical indications supporting his judgment that an abortion is necessary to avert her death or to avert substantial and irreversible impairment of major bodily function.

(c) PENALTY.—Any physician who violates the provisions of this section is guilty of "unprofessional conduct" and his license for the practice of medicine and surgery shall be subject to suspension or revocation.... Any physician who performs or induces an abortion without first obtaining the certification required by subsection (a)(4) or with knowledge or reason to know that the informed consent of the woman has not been obtained shall for the first offense be guilty of a summary offense and for each subsequent offense be guilty of a misdeameanor for the third degree. No physician shall be guilty of violating this section for failure to furnish the information required by subsection (a) if he or she can demonstrate, by a preponderance of the evidence, that he or she reasonably believed that furnishing the information would have resulted in a severely adverse effect on the physical or mental health of the patient.

(d) LIMITATION ON CIVIL LIABILITY.—Any physician who complies with the provisions of this section may not be held civilly liable to his patient for failure to obtain informed consent to the abortion within the meaning of that term as defined by the act of October 15, 1975 (P.L. 390, No. 111), known as the Health Care Services Malpractice Act.

to it is not an absolute obstacle or severe limitation. In sum, we agree with Justice O'Connor's characterization of nearly identical requirements in *Akron:* such requirements "impose no undue burden or drastic limitation on the abortion decision." *Akron,* 462 U.S. at 472, 103 S.Ct. at 2515 (O'Connor, J., dissenting).

■ We also have no difficulty concluding that § 3205(a)(1) is rationally related to a legitimate state interest. In *Akron,* all nine Justices agreed that the state may require a woman contemplating an abortion to receive information about the nature and risks of the abortion procedure. This type of information "clearly is related to maternal health and to the State's legitimate purpose in requiring informed consent." *Akron,* 462 U.S. at 446, 103 S.Ct. at 2501. The Court in *Akron* also found that the state has a legitimate interest in requiring that an abortion provider inform the woman of the probable gestational age of the fetus. Finally, there is nothing irrational about a requirement that the provider inform the woman of the medical risks of carrying the pregnancy to term since this is obviously the only medical alternative to abortion. *See Thornburgh,* 476 U.S. at 830, 106 S.Ct. at 2215 (O'Connor, J., dissenting) (such a requirement provides "the kind of balanced information I would have thought all could agree is relevant to a woman's informed consent").[16]

■ Turning from the content of the required advice to the manner of its presentation, we think it patent that a state may rationally decide that physicians are better qualified than counselors to impart this information and answer questions about the medical aspects of the available alternatives. While the record contains evidence that counselors at the clinics are often capable of informing women about the abortion procedure, that is not the issue; the issue is whether the state may rationally

conclude that physicians as a class are better equipped to provide such medical information and answer questions about the abortion procedure and the alternative. We believe the Commonwealth could rationally so conclude and, accordingly, that § 3205(a)(1) is a constitutionally valid regulation. *Cf. Williamson v. Lee Optical,* 348 U.S. 483, 487, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955).

### 2. Counselor–Disclosed Information

■ Section 3205(a)(2) requires that a physician or counselor ("any qualified agent of the physician") inform a woman: (i) that medical assistance benefits may be available for prenatal, childbirth, and neonatal care and that more information about the benefits is available in state-printed materials; (ii) that the father of the child is liable to assist in support of the child (this information is not required to be given in rape cases); and (iii) that the Pennsylvania Department of Health publishes printed materials which describe the fetus at various intervals and list agencies which offer alternatives to abortion and that such materials are available free of charge.[17] Applying the threshold undue burden standard, we conclude that this provision does not cause an undue burden; in addition, we find it rationally related to a legitimate state interest. Therefore, we uphold it against the clinics' challenge.

Once again, the time required to provide the required information is minimal. While requiring that a physician or counselor impart this information will add some cost to the pre-abortion procedure at those clinics that do not already provide options counseling, nothing in the record suggests that the increase will be drastic or even substantial. Similarly, there is no evidence that any abortion provider will stop providing abortions because of this requirement. Indeed, the record indicates that most clinics already require that a counselor consult in

---

**16.** The district court stressed that a woman who has decided upon an abortion has no need to know about the risk of carrying to term. This misses what we perceive to be the relevant point. The state may rationally require that a woman not move forward on a decision to abort without evaluating that decision on an informed basis.

**17.** Section 3205(a)(3) requires that a copy of these printed materials be available if the woman chooses to see them.

person with the woman about alternatives to abortion before the abortion is performed.

Justice O'Connor stated in *Thornburgh* that informed consent requirements could constitute an undue burden if the information required to be given was irrelevant, inaccurate, or inflammatory. *See Thornburgh*, 476 U.S. at 830–31, 106 S.Ct. at 2215–16 (O'Connor, J., dissenting). The information that § 3205 requires a physician or counselor to impart is relevant, accurate, and non-inflammatory. The information regarding the financial assistance to which the woman may be entitled is relevant in that it provides a woman with information necessary to make an informed choice. There is nothing on the face of the statute that suggests that this information is inaccurate. Nor do we see any threat that such information is inflammatory. Moreover, the printed materials concerning the fetus and alternatives to abortion are not forced on the woman; the woman is merely told that such information is available to her if she desires it. As Justice O'Connor stated in *Thornburgh*, "If the materials were sufficiently inflammatory and inaccurate the fact that the woman must ask to see them would not necessarily preclude finding an undue burden, but there is no indication that this is true of the description of fetal characteristics [or alternatives to abortion] the statute contemplates." *Id.* at 831, 106 S.Ct. at 2215 (O'Connor, J., dissenting). For these reasons, we conclude that this provision causes nowhere near the kind of burden that must result for a regulation to constitute an undue burden.

We further conclude that this provision is rationally related to a legitimate state interest. *Roe* recognized that the state has a legitimate interest in the potential life of the fetus throughout pregnancy, and a state may rationally conclude that this interest will be served by assuring that a pregnant woman have knowledge of the resources available to her should she elect to carry to term.

### 3. First Amendment Implications of Section 3205(a)

■ The clinics claim that § 3205(a) requires that a physician or counselor act as an instrument for the dissemination of an ideological message in violation of their First Amendment rights. We find the argument unpersuasive.

This case involves commercial speech, and the clinics do not dispute this point. The First Amendment limits on compelled disclosure requirements for commercial speech were explained by the Court in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985).[18] There, the Court rejected an attorney's challenge to a state requirement that he include certain information in an advertisement. The Court stressed that the attorney overlooked "material differences between disclosure requirements and outright prohibitions on speech." *Id.* at 650, 105 S.Ct. at 2281. Disclosure requirements are permissible so long as they are not a state attempt to prescribe what is "orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.* at 651, 105 S.Ct. at 2282. The Court then held that First Amendment rights "are adequately protected so long as disclosure requirements are reasonably related to the state's interest in preventing deception of consumers." *Id.*

Here, none of the information that § 3205 requires that physicians and counselors provide, including the information offered in the printed materials, has been shown to be false or unverifiable. It is not an attempt to prescribe an orthodoxy in matters of opinion, and the information involved is reasonably related to the state's interest in ensuring that women have relevant information before having an abor-

---

**18.** The clinics' reliance on *Riley v. National Federation for the Blind,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988), is misplaced. The Court there distinguished its case, which did not involve commercial speech, from other cases, and stated that "[p]urely commercial speech is more susceptible to compelled disclosure requirements." *Id.* at 796 n. 9, 108 S.Ct. at 2675 n. 9.

tion.[19] We thus hold that the informed consent requirements do not violate the First Amendment.

### 4. The 24–Hour Waiting Period

■ Section 3205(a) of the Act requires a mandatory 24–hour waiting period between the time that the physician and counselor provide the required information to a woman and the time that a physician performs the abortion. The woman's consent to the abortion may be given at any time during that period, including right before the abortion.

As the clinics stress, a 24–hour waiting period may result in delays considerably longer than 24 hours because most clinics do not perform abortions every day of the week. Moreover, such a waiting period may require a woman to make two visits to a clinic rather than one. Where the woman has no clinic immediately available and must travel to obtain an abortion, this means that the overall cost of an abortion to her may increase by a significant percentage. And as the district court pointed out, the burden of an additional trip to the clinic falls most heavily on battered wives who often find it difficult to free themselves of their husband's surveillance.

Despite these adverse consequences from the 24–hour waiting period, however, we conclude that this requirement does not constitute an undue burden. In *Hodgson*, the Supreme Court concluded that a two-parent notification requirement with a judicial bypass was rationally related to a legitimate state interest and, therefore, was constitutional. Justice O'Connor noted that the Court had "explicitly approved judicial bypass as a means of tailoring a parental consent provision so as to avoid unduly burdening the minor's limited right to obtain an abortion." *Hodgson*, 110 S.Ct. at 2950 (O'Connor, J., concurring). The Court reached this conclusion despite the trial court's findings that "scheduling practices in Minnesota courts typically require minors to wait two or three days between their first contact with the court and the hearing on their petitions" and that this delay "may combine with other facts to result in a delay of a week or more." *Hodgson v. State of Minnesota*, 648 F.Supp. 756 (D.Minn.1986).

Given the Court's conclusion in *Hodgson* that the length of the delays and the increased costs occasioned by the judicial bypass did not impose an undue burden on the right to an abortion or otherwise require strict scrutiny, we decline to reach a different result with respect to the Commonwealth's imposition of a 24–hour delay for considering the information required by the informed consent requirements.[20]

**19.** The disclosure required by the Pennsylvania Act is similar to a long list of regulations by state and federal governments designed to protect the public. For example, the federal government requires warnings on all cigarette packages, advertisements, and billboards. 15 U.S.C. § 1333 (1988). Federal law requires disclosure in the context of securities transactions. 15 U.S.C. § 78j(b) (1988). Pennsylvania requires financial institutions to disclose rates, terms, definitions, and other information in residential mortgage applications. 41 Pa.Stat.Ann. § 301(e) (Supp.1991).

The clinics' argument is potentially limitless; there is "no reason why a concern for professional freedom could be confined to the medical profession; nothing in the Constitution indicates a preference for the liberty of doctors over that of lawyers, accountants, bakers, or brickmakers." *Thornburgh*, 476 U.S. at 802–03, 106 S.Ct. at 2200–01 (White, J., dissenting). Thus, if this provision violated the First Amendment, the above-cited disclosure requirements would presumably also have to fall.

**20.** In *Akron*, the Supreme Court invalidated an Ohio statute that required a 24–hour delay so that the "woman's decision [would] be informed." 462 U.S. at 450, 103 S.Ct. at 2503. The Court reached this result applying strict scrutiny, however, and as we have explained, we are not bound by the result in *Akron* if, as we conclude, the Commonwealth's 24–hour waiting period imposes no undue burden. While Justices Stevens and O'Connor in *Hodgson* viewed *Akron's* 24–hour waiting period for an adult as less justified by the state's interest than a 48–hour waiting period for a minor after notification of a parent, 110 S.Ct. at 2944 n. 35, nothing said in *Hodgson* suggests to us that the Commonwealth's 24–hour waiting period is an undue burden. As Justice O'Connor stressed in *Hodgson*, the Court has consistently viewed judicial bypass provisions as a means of avoiding an undue burden and, it necessarily follows that the time required to pursue such a bypass cannot constitute one. That time varies depending on the statute involved, but necessarily involves at least several days. The judicial bypass ap-

Accordingly, we now inquire whether the 24–hour waiting period passes rational basis.[21] All parties agree that choosing to have an abortion is an important decision. The state's interest in ensuring that such a decision is *both* informed *and* well-considered is rationally related to the state's legitimate interest in the life and health of the mother as well as its interest in the potential life of the fetus. The waiting period "reasonably relates to the State's interest in ensuring that a woman does not make this serious decision in undue haste." *Akron*, 462 U.S. at 474, 103 S.Ct. at 2516 (O'Connor, J., dissenting).

■ In sum, we believe the waiting period is "a small cost to impose to ensure that a woman's decision is well considered in light of its certain and irreparable consequences on fetal life, and the possible effects on her own." *Akron*, 462 U.S. at 474, 103 S.Ct. at 2516 (O'Connor, J., dissenting).

We fully recognize that many women contemplating an abortion will have seriously considered their decision before the required consultations with physician and counselor take place. The waiting period may not for those women serve any purpose. But the wait does not prevent any women from having an abortion, and the possible overinclusiveness of the provision does not render it irrational, especially given the serious and irreversible consequences of a hasty and ill-considered abortion decision.

### C. *Parental Consent with Judicial Bypass*

■ For women under 18 who desire an abortion, § 3206 of the Act requires the informed consent of at least one parent, but provides a judicial bypass option if a woman does not wish to or cannot obtain a parent's consent.[22]

proved in *Planned Parenthood v. Ashcroft,* 462 U.S. 476, 477 n. 4, 491 n. 16, 103 S.Ct. 2517, 2519 n. 4, 2525 n. 16, 76 L.Ed.2d 733 (1983), could require 17 calendar days; the bypass approved in *Ohio v. Akron Center for Reproductive Health,* — U.S. ——, 110 S.Ct. 2972, 2980–81, 111 L.Ed.2d 405 (1990), could require 14 days.

21. The Court in *Akron* in striking down a similar 24–hour waiting period occasionally used language similar to that of rational basis review in considering the relationship between a waiting period and maternal health. However, we believe that the Court's level of review in *Akron* for all abortion regulations was strict scrutiny. *See Akron,* 462 U.S. at 428–31, 103 S.Ct. at 2491–93 (outlining *Roe* standard); *Hodgson,* 110 S.Ct. at 2952 (Marshall, J., dissenting) (citing *Akron* in stating, "we have subjected state laws limiting that right to the most exacting scrutiny, requiring a State to show that such a law is narrowly drawn to serve a compelling state interest").

22. Section 3206 of the Act provides in part:
 (a) GENERAL RULE.—Except in the case of a medical emergency, or except as provided in this section, if a pregnant woman is less than 18 years of age and not emancipated, or if she has been adjudged an incompetent ..., a physician shall not perform an abortion upon her unless, in the case of a woman who is less than 18 years of age, he first obtains the informed consent both of the pregnant woman and of one of her parents; or, in the case of a woman who is incompetent, he first obtains the informed consent of her guardian.

 . . . . .

 (c) PETITION TO COURT FOR CONSENT.—
If both of the parents or guardians of the preg-

nant woman refuse to consent to the performance of an abortion or if she elects not to seek the consent of either of her parents or of her guardian, the court of common pleas of the judicial district in which the applicant resides or in which the abortion is sought shall, upon petition or motion, after an appropriate hearing, authorize a physician to perform the abortion if the court determines that the pregnant woman is mature and capable of giving informed consent to the proposed abortion, and has, in fact, given such consent.
 (d) COURT ORDER.—If the court determines that the pregnant woman is not mature and capable of giving informed consent or if the pregnant woman does not claim to be mature and capable of giving informed consent, the court shall determine whether the performance of an abortion upon her would be in her best interests. If the court determines that the performance of an abortion would be in the best interests of the woman, it shall authorize a physician to perform the abortion.

 . . . .

 (f) PROCEEDINGS.—
 (1) Court proceedings under this section shall be confidential and shall be given such precedence over other pending matters as will ensure that the court may reach a decision promptly and without delay in order to serve the best interests of the pregnant woman. In no case shall the court of common pleas fail to rule within three business days of the date of application. A court of common pleas which conducts proceedings under this section shall make in writing specific factual findings and legal conclusions supporting its decision and shall,

An absolute parental consent requirement with no exceptions would cause an undue burden on a minor woman's abortion decision because it would impose an absolute veto and take the decisionmaking power from the woman contemplating an abortion. *Cf. Hodgson*, 110 S.Ct. at 2949–50 (O'Connor, J., concurring); *Akron*, 462 U.S. at 464, 103 S.Ct. at 2510 (O'Connor, J., dissenting). The Pennsylvania statute, however, provides a judicial bypass option, and the Supreme Court, including Justice O'Connor, has consistently held that any undue burden caused by a parental notification or consent statute is alleviated if it provides a judicial bypass option that comports with the requirements outlined in *Bellotti v. Baird*, 443 U.S. 622, 663–64, 99 S.Ct. 3035, 3063–64, 61 L.Ed.2d 797 (1979) (*"Bellotti II"*). *See Hodgson*, 110 S.Ct. at 2950–51 (O'Connor, J., concurring); *id.* at 2970 (opinion of Kennedy, J.); *Ohio*, 110 S.Ct. at 2978–81; *see also Planned Parenthood v. Miller*, 934 F.2d 1462, 1475–82 (11th Cir.1991). Thus, so long as an adequate judicial bypass procedure existed, the Court has upheld many different forms of parental consent and parental notification laws, including two-parent consent and two-parent notification. *See Bellotti II*, 443 U.S. at 643, 99 S.Ct. at 3048 ("We therefore conclude that if the State decides to require a pregnant minor to obtain one or both parents' consent to an abortion, it also must provide an alternative procedure whereby authorization for the abortion can be obtained."); *Hodgson*, 110 S.Ct. at 2970 (opinion of Kennedy, J.) ("The simple fact is that our decision in *Bellotti II* stands for the proposition that a two-parent consent law is constitutional if it provides for a sufficient judicial bypass alternative.").[23]

*Bellotti II* set out the constitutional requirements for a bypass procedure that the Court has followed in a number of subsequent cases:

> A pregnant minor is entitled in such a proceeding to show either: (1) that she is mature enough and well enough informed to make her abortion decision, in consultation with her physician, independently of her parents' wishes; or (2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests. The proceeding in which this showing is made must assure that a resolution of the issue, and any appeals that may follow, will be completed with anonymity and sufficient expedition to provide an effective opportunity for an abortion to be obtained.

*Bellotti II*, 443 U.S. at 622, 99 S.Ct. at 3037.

---

upon the initial filing of the minor's petition for judicial authorization of an abortion, order a sealed record of the petition, pleadings, submissions, transcripts, exhibits, orders, evidence and any other written material to be maintained which shall include its own findings and conclusions.

. . . . .

(3) The name of the pregnant woman shall not be entered on any docket which is subject to public inspection. All persons shall be excluded from hearings under this section except the applicant and such other persons whose presence is specifically requested by the applicant or her guardian.

. . . . .

(h) REGULATION OF PROCEEDINGS.—
. . . Any court to which an appeal is taken under this section shall give prompt and confidential attention thereto and shall rule thereon within five business days of the filing of the appeal.

. . . . .

(i) PENALTY.—Any person who performs an abortion upon a woman who is an unemanci-

pated minor or incompetent to whom this section applies either with knowledge that she is a minor or incompetent to whom this section applies, or with reckless disregard or negligence as to whether she is a minor or incompetent to whom this section applies, and who intentionally, knowingly or recklessly fails to conform to any requirement of this section is guilty of "unprofessional conduct" and his license for the practice of medicine and surgery shall be suspended . . . for a period of at least three months.

**23.** The district court held that the requirement of "informed" parental consent would necessitate in-person parental consent. We need not decide whether that is correct, for any burden caused by one-parent, in-person consent is surely no more than that caused by two-parent consent, *cf. Hodgson*, 110 S.Ct. at 2970; and the Supreme Court has held that a judicial bypass option alleviates the undue burden caused by two-parent consent requirements.

The Pennsylvania Act's bypass procedure complies with each of the four requirements set forth in *Bellotti II*. Under § 3206, if a minor woman does not wish to or cannot obtain the consent of a parent, she may file a motion or petition with the court of common pleas in the district where she lives or in which the abortion is sought. A judge of the court of common pleas must hold a hearing, at which the woman has a right to court-appointed counsel. At the hearing, the judge must determine if the woman is mature and able to make her own decision and has in fact consented to the abortion. If so, the judge must allow the abortion. Furthermore, if the judge finds that the woman is not mature and able to make her own decision, the judge must decide if an abortion would nevertheless be in her best interests. 18 Pa. Cons.Stat. Ann. § 3206(c)–(d) (1983 & Supp.1991). This statutory language mirrors the *Bellotti II* requirements for the factors that must guide a judge in making this decision.

In accordance with *Bellotti II*, the statute requires that the proceedings be confidential. *Id.* § 3206(f). Initials must be used to identify the woman in all documents. The hearing before the common pleas judge must be closed, and the appeals procedure must also be confidential. The record of the proceedings must be sealed.

Section 3206 also meets the promptness requirement of *Bellotti II*. Section 3206 requires that the court hold the hearing and render a decision within three business days of the application by the woman. The woman has a right to appeal to the Superior Court if the court of common pleas does not grant her permission. The Superior Court decision must be rendered within five business days of the filing of an appeal. *Id.* § 3206(f), (h). This entire procedure should last no longer than eight business days. In *Ohio*, the Supreme Court upheld Ohio's bypass procedure, which required the trial court to make its decision within five business days and required the court of appeals to decide within nine days after the filing of a notice of appeal. 110 S.Ct. at 2980. The Pennsylvania statute requires a quicker decision than did Ohio's,

and the Supreme Court held that Ohio's procedure was sufficiently prompt. The Commonwealth's bypass procedure thus meets the *Bellotti II* requirements and alleviates the undue burden that would be caused by a parental consent statute with no judicial bypass. *Cf. Glick v. McKay*, 937 F.2d 434 (9th Cir.1991) (striking down parental consent statute because bypass provision did not specify time in which judge had to render decision).

We further conclude that requiring parental consent in combination with a judicial bypass procedure passes rational basis review. It is not irrational for the state to require adult guidance for a minor woman, eleven or twelve years old in some cases, *see* 744 F.Supp. at 1343, in deciding whether to obtain an abortion. *See Hodgson*, 110 S.Ct. at 2950–51 (O'Connor, J., concurring); *Ohio*, 110 S.Ct. at 2983–84; *H.L. v. Matheson*, 450 U.S. 398, 411, 101 S.Ct. 1164, 1172, 67 L.Ed.2d 388 (1981); *Bellotti II*, 443 U.S. at 634–37, 640–41, 99 S.Ct. at 3043–45, 3046–47; *Danforth*, 428 U.S. at 91, 96 S.Ct. at 2851 (Stewart, J., concurring).

### D. *Spousal Notice*

Next, we address the issue in this case that presents the most difficult application of the undue burden standard. Section 3209 of the Act requires that, before a physician may perform an abortion on a married woman, the woman must sign a statement that she has notified her husband of her intended abortion. The Commonwealth is to provide the forms for these statements, and each form must bear a notice that false statements are punishable by law. Besides the standard medical emergency exception, § 3209 contains four other important exceptions. A woman is not required to notify her husband if: (1) her husband is not the father; (2) her husband, after diligent effort, cannot be located; (3) the pregnancy is a result of spousal sexual assault which has been reported to a law enforcement agency; or (4) the woman has reason to believe that notifying her husband is likely to result in the infliction of bodily injury by her spouse or by anoth-

er individual.[24] If the woman provides a false statement on the form, she may be liable for a misdemeanor of the third degree. Any physician who performs an abortion without complying with this section may be subject to civil penalties.

First, we must consider whether § 3209 imposes an undue burden on the woman's abortion decision. At this point, it is important to emphasize that we do not consider the countervailing interest of the husband; we consider *only* the burden imposed on the woman. After we conduct this threshold analysis, as we must, *then* we will address the Commonwealth's interest in furthering the husband's interest.

▮ A spousal notice requirement does not cause a drastic or severe time delay, increase in costs, or decrease in the number of abortion providers. Nor does it give a state-sanctioned veto power over the woman's abortion decision to another person. But as Justice O'Connor noted in *Hodgson*, a provision requiring a woman to notify another person before obtaining an abortion can impose an undue burden in two other ways. First, the act of finding the person to whom notice must be given may constitute an undue burden. In *Hodgson*, so many parents in Minnesota were divorc-

ed that it would have been a great burden in many cases for the child to track down the other parent. This is not a problem with the Commonwealth's spousal notification requirement, however, since it allows a woman to certify that her husband, after diligent effort, could not be notified. Second, the giving of notice and the consequences thereof may constitute a severe limitation on the woman's abortion decision. The notified person, for example, may effectively prevent the abortion or may severely penalize the woman in other ways if she exercises her right to obtain an abortion. *Cf. Hodgson*, 110 S.Ct. at 2939. Such consequences were found to constitute undue burdens on a woman's right to an abortion in both *Bellotti II* and *Hodgson.*

In *Bellotti v. Baird* ("*Bellotti I*"), 428 U.S. 132, 145, 96 S.Ct. 2857, 2865, 49 L.Ed.2d 844 (1976), the Court noted that one proffered interpretation of the Massachusetts statute requiring parental consent would allow minor women to obtain permission for abortion in a bypass proceeding, thus avoiding the "undue burden" caused by forced "consultation." Then, in *Bellotti II*, the Court held that the statute did not meet constitutional standards because, as construed by the courts of Massachusetts,

---

**24.** Section 3209 of the Act states:

(a) SPOUSAL NOTICE REQUIRED.—In order to further the Commonwealth's interest in promoting the integrity of the marital relationship and to protect a spouse's interests in having children within marriage and in protecting the prenatal life of that spouse's child, no physician shall perform an abortion on a married woman, except as provided in subsections (b) and (c), unless he or she has received a signed statement, which need not be notarized, from the woman upon whom the abortion is to be performed, that she has notified her spouse that she is about to undergo an abortion. The statement shall bear a notice that any false statement made therein is punishable by law.

(b) EXCEPTIONS.—The statement certifying that the notice required by subsection (a) has been given need not be furnished where the woman provides the physician a signed statement certifying at least one of the following:

(1) Her spouse is not the father of the child.

(2) Her spouse, after diligent effort, could not be located.

(3) The pregnancy is a result of spousal sexual assault as described in section 3128 (relating to spousal sexual assault), which has been re-

ported to a law enforcement agency having the requisite jurisdiction.

(4) The woman has reason to believe that the furnishing of notice to her spouse is likely to result in the infliction of bodily injury upon her by her spouse or by another individual.

Such statements need not be notarized, but shall bear a notice that any false statements made therein are punishable by law.

(c) MEDICAL EMERGENCY.—The requirements of subsection (a) shall not apply in the case of a medical emergency.

. . . . .

(e) PENALTY; CIVIL ACTION.—Any physician who violates the provisions of this section is guilty of "unprofessional conduct," and his or her license for the practice of medicine and surgery shall be subject to suspension or revocation.... In addition, any physician who knowingly violates the provisions of this section shall be civilly liable to the spouse who is the father of the aborted child for any damages caused thereby and for punitive damages in the amount of $5,000, and the court shall award a prevailing plaintiff a reasonable attorney fee as part of costs.

the bypass procedure was available only after the minor had notified, and unsuccessfully sought consent from, her parents. The Court concluded:

> We think that, construed in this manner, § 12S would impose an undue burden upon the exercise by minors of the right to seek an abortion. As the District Court recognized, "there are parents who would obstruct, and perhaps altogether prevent, the minor's right to go to court." *Baird III* [*v. Bellotti*] 450 F. Supp. [997] at 1001. [D.C.Mass. (1978)] There is no reason to believe that this would be so in the majority of cases where consent is withheld. But many parents hold strong views on the subject of abortion, and young pregnant minors, especially those living at home, are particularly vulnerable to their parents' efforts to obstruct both an abortion and their access to court.

*Bellotti II,* 443 U.S. at 647, 99 S.Ct. at 3050.

In *Hodgson,* the Court rejected a two-parent notice requirement that did not provide a judicial bypass option. As we have noted, Justice O'Connor, the fifth vote necessary for the majority, found that a two-parent notification requirement was an "undue burden" on the abortion decision. 110 S.Ct. at 2950.[25] Justice Stevens, writing for a majority of the Justices, including Justice O'Connor, described the burden imposed by the notice requirement in the following terms:

> The record reveals that in the thousands of dysfunctional families affected by this statute, the two-parent notice requirement proved positively harmful to the minor and her family. The testimony at trial established that this requirement, ostensibly designed for the benefit of the

minor, resulted in major trauma to the child, and often to a parent as well. In some cases, the parents were divorced and the second parent did not have custody or otherwise participate in the child's upbringing. App. 244–245; *id.* at 466; *id,* at 115. In these circumstances, the privacy of the parent and child was violated, even when they suffered no other physical or psychological harm. In other instances, however, the second parent had either deserted or abused the child, *id.* at 462, 464, had died under tragic circumstances, *id.* at 120–121, or was not notified because of the considered judgment that notification would inflict unnecessary stress on a parent who was ill. *Id.* at 204, 465.

\* \* \* \* \* \*

The most common reason for not notifying the second parent was that that parent was a child or spouse-batterer, App. at 204, and notification would have provoked further abuse.

*Hodgson,* 110 S.Ct. at 2945 & n. 36.

The Supreme Court has thus been attuned to the real-world consequences of forced notification in the context of minor child/parent relationships and has found an undue burden to exist where there is a realistic likelihood either of parents preventing the abortion or of parents causing serious physical or psychological trauma for the pregnant child. In this case, we conclude that the real-world consequences of forced notification in the context of wife/husband relationships impose similar kinds of undue burdens on a woman's right to an abortion.

Most married women will discuss the abortion decision with their husbands. As Justice Stevens noted in *Hodgson,* a notifi-

---

**25.** Judge Alito disagrees with our interpretation of Justice O'Connor's application of the undue burden standard in *Hodgson.* We agree with Judge Alito that Part I of Justice O'Connor's opinion in *Hodgson* is ambiguous; however, Part II clarifies her reasoning. As we noted above, Justice O'Connor in Part II of her opinion in *Hodgson* explained that the Court often had approved parental consent and notice provisions that contained a bypass option because a bypass option tailors a consent or notice statute

"so as to avoid unduly burdening" the abortion right. *Hodgson,* 110 S.Ct. at 2950 (O'Connor, J., concurring). Justice O'Connor thus found constitutional the Minnesota statute that contained the bypass option. If a bypass procedure renders a parental notice provision constitutional because it alleviates the undue burden of the notice requirement, we think it follows that a parental notice requirement without the bypass option constitutes an undue burden.

cation requirement is unnecessary and serves no state interest in those instances. 110 S.Ct. at 2945. The relevant burdens to be assessed are those imposed by § 3209 on women who would choose not to notify their husbands in the absence of state compulsion to do so.

The district court found that § 3209's notification requirement creates a substantial risk that women who would otherwise have an abortion will be prevented from having one. Abortion is a matter about which individuals have deeply held and strongly felt convictions, often rooted in moral or religious commitment. In those situations where a husband is sufficiently opposed to abortion or sufficiently desirous of having a child that the wife will not voluntarily share the fact of her pregnancy and her intention to abort with him, the clinics' experts testified that coerced notification will predictably result in an effort to prevent the abortion. That testimony showed that the husband's response will frequently take a variety of forms other than persuasive discourse.

Many husbands are capable of violence in circumstances of this kind and will use physical force and the threat thereof to keep the wife from access to the clinic. But physical force is not the only means at the disposal of a husband who seeks to prevent an abortion. In the numerous households where the husband alone holds the economic power, the wife is in as vulnerable a position as the pregnant minor discussed in *Bellotti II.* The husband can simply decline to pay for the abortion and/or threaten to withhold future economic support unless the woman decides to forego the abortion. Finally, the record reveals that the forms of effective psychological coercion available to a husband are potentially unlimited and include the ultimate threat of a dissolution of the marriage.

One form of psychological coercion warrants special note because of the potential toll it may take on the wife and its resulting effectiveness as a deterrent. We have often spoken about the value placed by our society on the right of each individual to

privacy concerning personal health information. *See, e.g., United States v. Westinghouse Electric Corp.,* 638 F.2d 570, 577 (3d Cir.1980); *see also Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 876–77, 51 L.Ed.2d 64 (1977). The only thing we can think of more personal and intimate than the fact that one is carrying a child is the fact that one intends to seek an abortion. When the state forces spousal notification on a wife in a seriously troubled marriage, or even a wife in an untroubled marriage with a husband unalterably opposed to abortion, it compels disclosure of very intimate information with no assurance of confidentiality to someone highly motivated to make a public disclosure. As the district court found, the threat of exposure of the abortion decision to family, friends, and the community at large is likely to be a very substantial deterrent to a woman's pursuing her decision to abort.

Prevention of a planned abortion is not the only foreseeable consequence of coerced notification, however. Even if the woman is not deterred from pursuing an abortion, the same arsenal of physical, economic, and psychological abuse is available to the notified husband to penalize the wife for exercising her constitutionally bestowed right. Nor is the effect of § 3209 limited to those situations in which the wife gives notice pursuant to the statute. Just as the principal power of Damocles' sword is in its hanging rather than its fall, the primary effect of § 3209 may well be on those women who desire an abortion but who choose to carry to term because of the feared consequences of giving notice to their husbands.

The Pennsylvania legislature has not been unmindful of the burdens imposed on pregnant wives by § 3209 and has attempted to ease or avoid a number of them by including exceptions. Section 3209, for example, speaks to the dilemma of a woman who "has reason to believe that the furnishing of notice to her spouse is likely to result in the infliction of bodily injury upon her by her spouse or by another individual." A woman with such a fear may avoid notification by certifying her fear to her physician on a form provided by the Com-

monwealth. While ameliorative, this exception does not save § 3209 from being unduly burdensome in the constitutional sense. The district court found, with appropriate record support, that battered spouses are psychologically incapacitated from making the assertion required by the statute even when there is ample objective basis for the required fear. Many other women who have never before been the victims of "bodily injury" at the hands of their husband, may subjectively fear that notice may occasion "the first time," but conclude that they lack the requisite "reason to believe." Moreover, it is not clear to us that the "fear of bodily injury" exception was intended to aid those women whose access to an abortion is blocked by physical constraints or who reasonably fear physical abuse and the attendant suffering, but cannot conscientiously represent that injury to their bodies is likely to occur.

If physical violence were the only burden reasonably predictable from coerced spousal notification we might be inclined in this facial challenge to hold that the fear of bodily injury exception was sufficient to avoid an undue burden, at least until the effects of the Act in practice are known. But as we have previously stressed, physical violence is *not* the only burden reasonably predictable. The record reveals and the district court found that if § 3209 is allowed to go into effect, abortions can and will be prevented by economic and psychological duress and wives can and will be penalized by such duress for electing abortions.

One other of § 3209's exceptions warrants comment in our assessment of the burdens imposed by that section. The record demonstrates and the district court found that many women consent to sexual intercourse with their husbands solely to avoid greater physical or psychological abuse. Section 3209 provides that when a

child is conceived in the course of coerced sex, notification need not be given, if, but only if, the wife reports her husband to law enforcement authorities having jurisdiction over the matter. While this limitation on the exception is understandably imposed to discourage misrepresentations at the time an abortion is sought, its motivation does not ease the impact of the notification requirement on a woman who finds herself pregnant as a result of a sexual assault by her spouse. Given the devastating effect that a report to law enforcement authorities is likely to have on the marital relationship and the economic support provided the wife by the marriage, we believe it would be unrealistic to find that such a woman's right to choose an abortion is not severely burdened by § 3209. *Cf. Hodgson,* 110 S.Ct. at 2950 (O'Connor, J., concurring).

Because of the nature of the marriage relationship and the emotional character of human response to pregnancy and abortion, the number of different situations in which women may reasonably fear dire consequences from notifying their husbands is potentially limitless.[26] Because fear of those consequences is likely to dissuade many from seeking an abortion if such notification is required and because the consequences themselves are an undue burden, we hold that § 3209 constitutes an undue burden on a woman's abortion decision.

Accordingly, we must apply strict scrutiny to determine if § 3209 is narrowly tailored to serve a compelling state interest. Section 3209 expressly states that the spousal notice requirement is designed to further three state interests: promoting the integrity of the marital relationship, protecting a spouse's interests in having children within marriage, and protecting a spouse's interest in the prenatal life of that spouse's child.

**26.** The district court's list of situations in which spousal notification is likely to cause dire consequences for the women include, *inter alia:* women who reasonably fear retaliatory psychological abuse; women who reasonably fear retaliatory physical or psychological abuse of their children; women who are separated following a failed marriage relationship and for whom renewal of contact may produce severe emotional distress; women whose husbands have serious health problems and who reasonably fear that notification will be health threatening; and women whose marriages are severely troubled and who reasonably fear that notice will precipitate the demise of the marital relationship. 744 F.Supp. at 1386 n. 42.

We turn first to marital integrity. It is not entirely clear what the Commonwealth means when it speaks of the integrity of a marriage. If the interest is in honesty and full disclosure between married individuals, *Hodgson* indicates that this interest does not rise to the level of a legitimate state interest, much less a compelling one. In the course of striking down Minnesota's two-parent notice requirement without a judicial bypass, Justice Stevens there wrote for a majority of the court:

> The State does not rely primarily on the best interests of the minor in defending this statute. Rather, it argues that, in the ideal family, the minor should make her decision only after consultation with both parents who should naturally be concerned with the child's welfare and that the State has an interest in protecting the independent right of the parents "to determine and strive for what they believe to be best for their children." Minn.Br. 26. Neither of these reasons can justify the two-parent notification requirement. The second parent may well have an interest in the minor's abortion decision, making full communication among all members of a family desirable in some cases, but such communication may not be decreed by the State. The State has no more interest in requiring all family members to talk with one another than it has in requiring certain of them to live together.... [A] state interest in standardizing its children and adults, making the "private realm of family life" conform to some state-designed ideal, is not a legitimate state interest at all.

*Hodgson*, 110 S.Ct. at 2946.

If the state's alleged interest in the integrity of the marriage refers to the state's interest in keeping married individuals together in wedlock, we agree that this is a legitimate state interest. It is not an interest that the Supreme Court has recognized as a compelling one, however. Moreover, even if we were to assume that it does constitute a compelling state interest, we could not conclude that the Commonwealth has carried its burden of demonstrating that § 3209 is narrowly tailored to promote that interest. As we have noted, the only effect of § 3209 is to require notice in those instances in which the wife would not otherwise share with her husband the fact of the pregnancy and her intention to abort. In such situations, an across-the-board requirement of coerced disclosure is an altogether arbitrary approach to a difficult and complex problem of human relations. Nothing in this record suggests that replacing the wife's judgment regarding disclosure with such an arbitrary rule will save more marriages than it destroys.

The Commonwealth asserts that § 3209 furthers its interests in furthering the husband's interest both in having children within the marriage and in the fetus. To the extent that these interests are distinct, the abstract interest in having children within the marriage is not more substantial than the interest in the fetus. Therefore, we will now turn to the most difficult issue: the state's interest in furthering the husband's interest in the individual fetus. In *Danforth*, in discussing a spousal consent requirement, the Court recognized the state's *legitimate* interest in the husband's interest in the fetus. Justice Blackmun for the Court stated that the Court was "not unaware" of the "deep and proper concern and interest" that a husband has in his wife's pregnancy and in the growth and development of the fetus she is carrying. *Danforth*, 428 U.S. at 69, 96 S.Ct. at 2840. Nevertheless, the Court struck down the spousal consent requirement in *Danforth*, finding that the state's interest in supporting the husband's interest in the fetus was insufficient to override the wife's right to an abortion:

> Notwithstanding these factors, we cannot hold that the State has the constitutional authority to give the spouse unilaterally the ability to prohibit the wife from terminating her pregnancy, when the State itself lacks that right. *See Eisenstadt v. Baird*, 405 U.S. 438, 453 [92 S.Ct. 1029, 1038, 31 L.Ed.2d 349] (1972).

\* \* \* \* \* \*

As the Court recognized in *Eisenstadt v. Baird*, "the marital couple is not an

independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup. If the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." 405 U.S., at 453 [92 S.Ct. at 1038] (emphasis in original).

*Danforth*, 428 U.S. at 70 & n. 11, 96 S.Ct. at 2841 & n. 11. *Danforth* can be read to stand for the proposition that the state's interest in protecting a husband's interest in a previable fetus within his marriage is not a compelling one. It must be read at least to hold that that interest must yield to the wife's right to have an abortion. Thus, the state cannot vindicate the husband's interest in a fetus, and § 3209 was enacted with that realization.

Section 3209, despite its preamble, does not protect the husband's interest in the fetus; under *Danforth*, as we have noted,

a state statute cannot constitutionally protect that interest. What § 3209 seeks to preserve for the husband is something considerably more modest: the possibility of participating in a decision his wife is constitutionally privileged to make on her own for her own reasons. While promoting the possibility of spousal participation is undoubtedly a legitimate state interest, we conclude in light of *Danforth* that it is not the kind of compelling state interest that can justify the very substantial burdens imposed by § 3209 on the wife's right to choose an abortion.

In sum, we hold that § 3209 is unconstitutional because it imposes an undue burden on a woman's abortion decision and does not serve a compelling state interest.[27]

### E. *Confidential Medical Reports*

■ An abortion provider must file a report with the Department of Health for every abortion performed at its facility. 18 Pa.Cons.Stat.Ann. § 3214(a) (1983 & Supp. 1991). Each report must include a variety of information about the abortion.[28] Be-

---

**27.** Our conclusion that § 3209 is unconstitutional does not prevent the Commonwealth from putting into effect the rest of the Act's provisions. The Act contains a broad severability provision. "The provisions of this act are severable. If any word, phrase or provision of this act or its application to any person or circumstance is held invalid, the invalidity shall not affect any other word, phrase or provision or application of this act which can be given effect without the invalid word, phrase, provision or application." Act of November 17, 1989, 1989 Pa.Laws 592, No. 64, § 6. In addition, Pennsylvania has a general severability statute. 1 Pa. Cons.Stat.Ann. § 1925 (Supp.1991). Severability is a question of state law. *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 818, 109 S.Ct. 1500, 1509, 103 L.Ed.2d 891 (1989). Because the remainder of the Act may be given effect without § 3209, we conclude that § 3209 may be severed from the Act in accordance with Pennsylvania law.

**28.** The relevant text of § 3214 provides:

(a) GENERAL RULE.—For the purpose of promotion of maternal health and life by adding to the sum of medical and public health knowledge through the compilation of relevant data, and to promote the Commonwealth's interest in protection of the unborn child, a report of each abortion performed shall be made to the department on forms prescribed by it. The report forms shall not identify the individual

patient by name and shall include the following information:

(1) Identification of the physician who performed the abortion, the concurring physician as required by section 3211(c)(2) (relating to abortion on unborn child of 24 or more weeks gestational age), the second physician as required by section 3211(c)(5) and the facility where the abortion was performed and of the referring physician, agency or service, if any.

(2) The county and state in which the woman resides.

(3) The woman's age.

(4) The number of prior pregnancies and prior abortions of the woman.

(5) The gestational age of the unborn child at the time of the abortion.

(6) The type of procedure performed or prescribed and the date of the abortion.

(7) Pre-existing medical conditions of the woman which would complicate pregnancy, if any, and, if known, any medical complication which resulted from the abortion itself.

(8) The basis for the medical judgment of the physician who performed the abortion that the abortion was necessary to prevent either the death of the pregnant woman or the substantial and irreversible impairment of a major bodily function of the woman, where an abortion has been performed pursuant to section 3211(b)(1).

(9) The weight of the aborted child for any abortion performed pursuant to section 3211(b)(1).

cause these reports are not open for public inspection and are subject to various safeguards against disclosure, *id.* § 3214(b), the district court concluded—and the clinics do not challenge the conclusion—that the Commonwealth had adequately assured the confidentiality of these reports.

In *Danforth,* the Court held that recordkeeping and reporting requirements are permissible so long as they are not used to accomplish "through the sheer burden of recordkeeping detail, what [the Court has] held to be an otherwise unconstitutional restriction," and so long as the reports are confidential. *Danforth,* 428 U.S. at 81, 96 S.Ct. at 2846. Furthermore, the reports must be rationally related to a legitimate state interest. *Id.*

The district court concluded that the Commonwealth could not constitutionally require of a doctor or clinic four of the many items of information listed in the statute: (1) the basis for the physician's determination of gestational age; (2) in a third trimester abortion, the basis for the physician's decision that a third trimester abortion was necessary for the life or health of the mother; (3) in a medical emer-

gency case, the basis for the physician's decision that a medical emergency suspended the statute's requirements; and (4) the identity of the referring physician.[29] 744 F.Supp. at 1391–95.

First, we address the three reporting requirements relating to the physician's medical judgments for particular types of abortions. The abortion provider must file one report for every abortion. The report will not cause by the "sheer burden of recordkeeping detail" a drastic increase in delay or cost, or a drastic decrease in availability. The district court's only relevant finding on this point was that compliance with this section had cost $12,000 per year for a clinic that performed 7,000 abortions per year. 744 F.Supp. at 1337, 1372. An added cost of at most a few dollars per abortion that the clinics may pass on to patients is not the kind of "drastic" increase necessary to constitute an undue burden. In addition, the reports are concededly confidential, and the reporting requirement does not constitute an undue burden on that basis. The reports are also rationally related to preservation of maternal health; they will enable the Commonwealth to discover how often and under

(10) Basis for any medical judgment that a medical emergency existed which excused the physician from compliance with any provision of this chapter.

(11) The information required to be reported under section 3210(a) (relating to determination of gestational age).

(12) Whether the abortion was performed upon a married woman and, if so, whether notice to her spouse was given. If no notice to her spouse was given, the report shall also indicate the reason for failure to provide notice.

(b) COMPLETION OF REPORT.—The report shall be completed by the hospital or other licensed facility, signed by the physician who performed the abortion and transmitted to the department within 15 days after each reporting month.

(i) PENALTIES.—

(1) Any person required under this section to file a report, keep any records or supply any information, who willfully fails to file such report, keep such records or supply such information at the time or times required by law or regulation is guilty of "unprofessional conduct" and his license for the practice of medicine and surgery shall be subject to suspension or revocation in accordance with procedures provided

under the act of October 5, 1978 (P.L. 1109, No. 261), known as the Osteopathic Medical Practice Act, the act of December 20, 1985 (P.L. 457, No. 112), known as the Medical Practice Act of 1985, or their successor acts.

(2) Any person who willfully delivers or discloses to the department any report, record or information known by him to be false commits a misdemeanor of the first degree.

(3) In addition to the above penalties, any person, organization or facility who willfully violates any of the provisions of this section requiring reporting shall upon conviction thereof:

(i) For the first time, have its license suspended for a period of six months.

(ii) For the second time, have its license suspended for a period of one year.

(iii) For the third time, have its license revoked. 18 Pa.Cons.Stat.Ann. § 3214(a), (i) (1983 & Supp.1991).

**29.** The Court in *Thornburgh* struck down similar reporting requirements because they were not confidential, 476 U.S. at 765–68, 106 S.Ct. at 2181–83; in that case, the report could unduly burden the abortion right by making public both information about the women who obtain abortions and information about the doctors who perform them.

what circumstances women obtain medically necessary abortions. Finally, the reports will confirm that clinics and physicians are complying with the Act's requirements.

The district court concluded that such a report would have a "chilling effect" on the exercise of the physician's judgment. We fail to perceive a chilling effect, however, other than on a physician who is not complying with the other provisions of the Act for medical emergencies, determination of gestational age, and third trimester abortions. Because those provisions themselves are constitutional, it seems unremarkable and not unduly burdensome that the Commonwealth requires this information in a report concerning an abortion.

With respect to the requirement of § 3214(a)(1) that the report concerning an abortion include the name of the performing and referring physicians, the district court concluded that the record was devoid of any evidence that a *performing* physician would be deterred from performing abortions by the requirement that the report include his or her name. 744 F.Supp. at 1391-92. Nevertheless, the district court concluded that some physicians might stop *referring* women for abortions if their names were included in the confidential report. *Id.* at 1392. The testimony at trial established that referring physicians zealously protect their anonymity, and we would face a different and more difficult case if there were a significant risk that such information would be disclosed. But given the district court's conclusions about the safeguards that will ensure confidentiality, we decline to conclude that refer-

ring physicians will be deterred in sufficient number that the availability of an abortion will be drastically reduced. Accordingly, we conclude that the requirement of disclosure of the identity of the names of the referred and performing physicians need only satisfy rational basis review.

As to rational basis, the district court found that the performing physician's name was properly included because he or she could answer questions that might arise about information contained in the reports. However, the district court felt that no similar reason existed for the referring physician's name. *Id.* This conclusion ignores the fact that the referring physician can perform some of the Act's requirements; the Act allows referring physicians both to obtain the woman's informed consent and to determine gestational age. We thus conclude that this requirement is rationally related to a legitimate state interest.

We hold that the confidential reporting requirements of § 3214(a) are constitutional.

### F. *Publicly Available Reports*

■ Abortion facilities must file with the Department of Health a report supplying the name and address of the facility and the name and address of affiliated organizations, such as parent or subsidiary corporations. 18 Pa.Cons.Stat.Ann. § 3207(b) (Supp.1991).[30] Every abortion facility must also file a report showing the total number of abortions performed, broken down by trimester, at the facility dur-

---

**30.** Section 3207(b) provides:

Within 30 days after the effective date of this chapter, every facility at which abortions are performed shall file, and update immediately upon any change, a report with the department, containing the following information:

(1) Name and address of the facility.

(2) Name and address of any parent, subsidiary or affiliated organizations, corporations or associations.

(3) Name and address of any parent, subsidiary or affiliated organizations, corporations or associations having contemporaneous commonality of ownership, beneficial interest, directorship or officership with any other facility.

The information contained in those reports which are filed pursuant to this subsection by facilities which receive State appropriated funds during the 12–calendar–month period immediately preceding a request to inspect or copy such reports shall be deemed public information. Reports filed by facilities which do not receive State appropriated funds shall only be available to law enforcement officials, the State Board of Medicine and the State Board of Osteopathic Medicine for use in the performance of their official duties. Any facility failing to comply with the provisions of this subsection shall be assessed by the department a fine of $500 for each day it is in violation hereof.

ing the preceding quarter year. 18 Pa. Cons.Stat.Ann. § 3214(f) (1991 Supp.).[31] If a facility has received public funds during the preceding year, the reports must be made available to the public.

The clinics do not attack these reporting requirements; they challenge only the mandate that reports of clinics receiving public funds be available to the public. More specifically, the argument presented by the clinics—and accepted by the district court—is that public disclosure of these reports will cause protests in front of clinics to proliferate and intensify, and that this will eventually reduce the number of abortion providers and the availability of abortions. Like the district court, we recognize that substantial public protest, directed toward both the clinics and the women entering them, occurs in front of abortion clinics. *See, e.g., Northeast Women's Center v. McMonagle*, 939 F.2d 57 (3d Cir. 1991). In its opinion, the district court detailed much of this activity and then concluded that the clinics had reasonable fears of increased protest from the public disclosure of these reports. The district court also concluded that some clinics might refuse the funds they receive for medically necessary abortions in order to avoid having their reports made available to the public. 744 F.Supp. at 1390–91.

We have considered this issue before in addressing nearly the same reporting requirements. *American College of Obstetricians v. Thornburgh*, 737 F.2d 283, 297–98 (3d Cir.1984) ("*ACOG*"), *aff'd on other grounds*, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986). Unless the clinics show a clear nexus between the disclosure requirement and increased private harassment, any attempt to argue that this requirement constitutes an undue burden

fails. *ACOG*, 737 F.2d at 297–98. Here, the clinics have not shown that the public disclosure requirement will so enlarge the number or escalate the severity of protests that they will become an absolute obstacle or severe limitation on a woman's abortion right. The clinics are publicly advertised and listed in the phone book, and many, if not all, encounter protests and demonstrations without this requirement. On the record as we review it—at a time before this provision has been implemented—we cannot conclude that the public disclosure requirement will result in an absolute obstacle or severe limitation on a woman's abortion decision. We thus conclude, as we did in the previous incarnation of this challenge, that §§ 3207(b) and 3214(f) do not constitute an undue burden because the clinics have not "demonstrated a nexus between the disclosure of such information and the chilling of constitutional rights." *Id.* at 297.

The next question is whether this provision is rationally related to a legitimate state interest. Records relating to public expenditures and disbursements are generally available to the public under Pennsylvania law. 65 Pa.Stat.Ann. §§ 66.1, 66.2 (1959 & Supp.1991). When a state provides money to a private commercial enterprise, there is a legitimate public interest in informing taxpayers who the funds are benefiting and what services the funds are supporting. Thus, this requirement does not lack a rational basis.

The clinics also argue that the public disclosure requirement is an unconstitutional condition on the receipt of public funds. Under the doctrine of unconstitutional conditions, "government may not grant a benefit on the condition that the beneficiary surrender a constitutional

---

**31.** Section 3214(f) provides:

Every facility in which an abortion is performed within this Commonwealth during any quarter year shall file with the department a report showing the total number of abortions performed within the hospital or other facility during that quarter year. This report shall also show the total abortions performed in each trimester of pregnancy. Any report shall be available for public inspection and copying only if the facility receives State-appropriated funds

within the 12–calendar–month period immediately preceding the filing of the report. These reports shall be submitted on a form prescribed by the department which will enable a facility to indicate whether or not it is receiving State-appropriated funds. If the facility indicates on the form that it is not receiving State-appropriated funds, the department shall regard its report as confidential unless it receives other evidence which causes it to conclude that the facility receives State-appropriated funds.

right, even if the government may withhold that benefit altogether." Sullivan, *Unconstitutional Conditions*, 102 Harv.L.Rev. 1415, 1415 (1989). There are two major elements of a successful unconstitutional conditions challenge.

The first is that "the constitutional interest at issue ... rise to the level of a recognized right—indeed a *preferred* right normally recognized by strict judicial review." *Id.* at 1427. In this case, the constitutional right to abortion is implicated by these requirements; however, as we concluded above, this right is not unduly burdened by these disclosure requirements and thus strict scrutiny is not triggered. Therefore, it is not an unconstitutional conditions problem in the way that it would be if the Commonwealth prohibited a recipient of public funds from performing abortions at all. *Cf. Babbitt v. Planned Parenthood*, 479 U.S. 925, 107 S.Ct. 391, 93 L.Ed.2d 346 (1986), *aff'g* 718 F.2d 938 (9th Cir.1983).[32]

Having concluded that this requirement does not unduly burden the abortion right, rationally relates to a legitimate state interest, and does not present an unconstitutional condition on the receipt of public funds, we uphold §§ 3207(b) and 3214(f).

### IV.

We conclude that the undue burden standard adopted by Justice O'Connor was the narrowest grounds in the majority in *Webster* and *Hodgson* and is at present the law of the land. Applying the undue burden standard, we conclude that § 3209, the spousal notice provision, constitutes an undue burden. Since the state does not have a compelling interest in ensuring spousal notice, we hold § 3209 unconstitutional. However, none of the other provisions at issue here constitutes an undue burden, and each is rationally related to a legitimate state purpose. Thus, we uphold them against the clinics' challenge. We will affirm in part and reverse in part the judgment of the district court.

ALITO, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's judgment except insofar as it holds that 18 Pa.Cons.Stat. Ann. § 3209 (Supp.1991) (spousal notice) is unconstitutional. I also join all of the court's opinion except for the portions concerning Section 3209 and those interpreting Justice O'Connor's opinion in *Hodgson v. Minnesota*, —— U.S. ——, 110 S.Ct. 2926, 2949–51, 111 L.Ed.2d 344 (1990), to mean that the two-parent notification requirement without judicial bypass imposed an "undue burden" and was thus required to satisfy strict scrutiny.

---

**32.** The Supreme Court's abortion funding cases exemplify the second major element of an unconstitutional conditions case: the state may fund activities as it pleases, may refuse to fund other activities, and may prevent recipients of government funds from using those funds in ways the government does not permit; however, the government may not restrict a recipient of government funds from constitutionally-protected activities it chooses to perform with its own or private funds. *See Rust v. Sullivan*, —— U.S. ——, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991).

The Supreme Court has used these principles in deciding a number of abortion funding cases. In *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), the Court upheld a state regulation under which Medicaid recipients received payment for medical services related to childbirth, but not for those related to nontherapeutic abortions. Similarly, in *Poelker v. Doe*, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977), the Court upheld a city's policy of providing publicly financed hospital services for childbirth without providing corresponding services for nontherapeutic abortions. In *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), the Court upheld the federal government's refusal to fund medically necessary abortions though it funded other medically necessary services. In *Webster*, the Court upheld a state's ban on the use of public employees and facilities for the performance or assistance of nontherapeutic abortions. In *Rust*, the Court upheld the federal government's refusal to fund programs that refer women for abortions.

In the one abortion funding case where the Court has struck down a government restriction on abortion funding, a state had attempted to prohibit any recipient of any state funds from performing abortions, even if that recipient wished to provide abortion services with private funds. *Babbitt*, 479 U.S. at 925, 107 S.Ct. at 391. The problem in *Babbitt* was that the government had attempted to prohibit a recipient of government funds from using its own funds to exercise its constitutional right; that is an unconstitutional condition, but not one imposed by the legislation before us.

## I.

As the court suggests, the crux of this case concerns the identification of the constitutional standard that the lower courts must now apply in cases involving laws regulating abortion. For the reasons carefully explained in the court's opinion, I agree that *Webster v. Reproductive Health Services*, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), and *Hodgson* changed the law that we are bound to apply and that the test set out in Justice O'Connor's opinions now represents the governing legal standard.

My disagreement with the majority regarding a single provision of the Pennsylvania Abortion Control Act, 18 Pa.Cons. Stat.Ann. § 3201 *et seq.* (1983 & Supp. 1991), results from disagreement about the portion of Justice O'Connor's two-part test that must be applied to this provision. Under that test, as the majority explains, a law that imposes an "undue burden" must serve a "compelling" state interest. By contrast, a law that does not impose an "undue burden" must simply be "rationally" or "reasonably" related to a "legitimate" state interest. The majority holds that Section 3209 constitutes an undue burden. The majority therefore applies the first prong of the two-part test and strikes down Section 3209 on the ground that it does not serve a "compelling" interest. I do not believe that Section 3209 has been shown to impose an undue burden as that term is used in the relevant Supreme Court opinions; I therefore apply the second prong of the two-part test; and I conclude that Section 3209 is constitutional because it is "rationally related" to a "legitimate" state interest.

Although the majority and I apply different prongs of this two-part test, I see no indication that we disagree concerning the conclusion produced when either prong is applied to Section 3209. If the majority is correct that Section 3209 must satisfy heightened scrutiny, I agree that its constitutionality is doubtful. Similarly, I do not interpret the majority opinion to mean that Section 3209 cannot satisfy the rational relationship test. Indeed, the majority acknowledges that Section 3209 serves a "legitimate" interest. See majority opin. at 715, 716. Thus, my major disagreement with the majority concerns the question whether Section 3209 imposes an "undue burden," and I will therefore turn to that question.

## II.

A. Justice O'Connor has explained the meaning of the term "undue burden" in several abortion opinions. In *Akron v. Akron Center for Reproductive Health*, 462 U.S. at 464, 103 S.Ct. at 2510 (O'Connor, J., dissenting), she wrote that "an 'undue burden' has been found for the most part in situations involving absolute obstacles or severe limitations on the abortion decision." She noted that laws held unconstitutional in prior cases involved statutes that "criminalized *all* abortions except those necessary to save the life of the mother," inhibited " 'the vast majority of abortions after the first 12 weeks,' " or gave the parents of a pregnant minor an absolute veto power over the abortion decision. *Id.* (emphasis in original; citations omitted). She suggested that an "undue burden" would not be created by "a state regulation [that] may 'inhibit' abortions to some degree." *Id.* She also suggested that there is no undue burden unless a measure has the effect of *substantially* limiting access." *Id.* at 463, 103 S.Ct. at 2509, quoting *Carey v. Population Services International*, 431 U.S. 678, 688, 97 S.Ct. 2010, 2017, 52 L.Ed.2d 675 (1977) (emphasis added in Justice O'Connor's opinion).

Justice O'Connor reiterated the same analysis in *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 106 S.Ct. 2169 (1986). She wrote (*id.* at 828, 106 S.Ct. at 2214 (O'Connor, J., dissenting), quoting *Akron*, 462 U.S. at 464, 103 S.Ct. at 2510 (O'Connor, J., dissenting)):

An undue burden would generally be found "in situations involving absolute obstacles or severe limitations on the abortion decision," not wherever a state regulation "may 'inhibit' abortions to some degree."

She also criticized the majority for taking an approach under which "the mere possibility that *some women* will be less likely to choose to have an abortion by virtue of the presence of a particular state regulation suffices to invalidate it." *Id.* 476 U.S. at 829, 106 S.Ct. at 2214 (emphasis added).

Justice O'Connor's application of the undue burden test in several cases further illustrates the meaning of this test. In *Hodgson,* 110 S.Ct. at 2950–51, Justice O'Connor found that no undue burden was imposed by a law requiring notice to both parents or judicial authorization before a minor could obtain an abortion. Justice O'Connor reached this conclusion despite statistics adduced by Justice Marshall to show that mandatory parental notice may inhibit a significant percentage of minors from obtaining abortions (*id.* at 2953–54) (Marshall, J., dissenting) and despite the district court's finding, noted in Justice Marshall's dissent, that the judicial bypass option "so daunted" some minors that they felt compelled to carry to term (*id.* at 2959, *quoting* 648 F.Supp. at 763).

Justice O'Connor has also suggested on more than one occasion that no undue burden was created by the statute upheld in *H.L. v. Matheson,* 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981), which required parental notice prior to any abortion on an unemancipated minor. Instead, she has stated that this statute merely inhibited abortions to "some degree." *Thornburgh,* 476 U.S. at 828, 106 S.Ct. at 2214 (O'Connor, J., dissenting); *Akron,* 462 U.S. at 464, 103 S.Ct. at 2510 (O'Connor, J., dissenting). In dissent in *Matheson,* Justice Marshall argued that the statute would result in substantial interference with abortions sought by minors. He wrote (450 U.S. at 398, 101 S.Ct. at 1164) (Marshall, J., dissenting) that "the minor may confront physical or emotional abuse, withdrawal of financial support or actual obstruction of the abortion decision." These harms are almost identical to those that the majority in this case attributes to Section 3209. See

majority opin. at 711–12. *See also Planned Parenthood Association v. Ashcroft,* 462 U.S. 476, 505, 103 S.Ct. 2517, 2532, 76 L.Ed.2d 733 (1983) (O'Connor concurring and dissenting) (statute requiring parental consent or judicial authorization "imposes no undue burden").

Finally, Justice O'Connor has concluded that regulations that simply increase the cost of abortions, including regulations that may double the cost, do not create an "undue burden." *See Akron,* 462 U.S. at 434–35, 103 S.Ct. at 2494–95 (maj. op.); at 466–67, 103 S.Ct. at 2511–12 (O'Connor, J., dissenting). Justice O'Connor reached this conclusion even though it seems clear that such increased costs may well deter some women.

Taken together, Justice O'Connor's opinions reveal that an undue burden does not exist unless a law (a) prohibits abortion or gives another person the authority to veto an abortion or (b) has the practical effect of imposing "severe limitations," rather than simply inhibiting abortions " 'to some degree' " or inhibiting "some women." *Thornburgh,* 476 U.S. at 828, 829, 106 S.Ct. at 2213, 2214 (O'Connor, J., dissenting), *quoting Akron,* 462 U.S. at 464, 103 S.Ct. at 2510 (O'Connor, J., dissenting). Furthermore, Justice O'Connor's opinions disclose that the practical effect of a law will not amount to an undue burden unless the effect is greater than the burden imposed on minors seeking abortions in *Hodgson* or *Matheson* or the burden created by the regulations in *Akron* that appreciably increased costs. Since the laws at issue in those cases had inhibiting effects that almost certainly were substantial enough to dissuade some women from obtaining abortions, it appears clear that an undue burden may not be established simply by showing that a law will have a heavy impact on a few women but that instead a broader inhibiting effect must be shown.

In this case, the plaintiffs, who made a facial attack [1] on Section 3209, did not

---

**1.** Because the plaintiffs made a facial attack on Section 3209, they could not rely on a "worst-case analysis" (*Ohio v. Akron Center for Reproductive Health,* —— U.S. ——, 110 S.Ct. 2972, 2981, 111 L.Ed.2d 405 (1990)) or on proof showing only that the provision would impose an undue burden "under some conceivable set of circumstances" (*United States v. Salerno,* 481

prove that this provision would impose an undue burden. Section 3209 does not create an "absolute obstacle" or give a husband "veto power." Rather, this provision merely requires a married woman desiring an abortion to certify that she has notified her husband or to claim one of the statutory exceptions.

The plaintiffs also failed to carry their burden[2] of proving that Section 3209 if enforced would have the kind of broad practical impact needed to establish an "undue burden" under the opinions discussed above. Clearly the plaintiffs did not substantiate the impact of Section 3209 with the degree of analytical rigor that should be demanded before striking down a state statute. Cf. *Akron,* 462 U.S. at 463, 103 S.Ct. at 2510 (O'Connor, J., dissenting) (citation omitted) (courts should exercise " 'deliberate restraint' " before finding an undue burden " 'in view of the respect that properly should be accorded legislative judgments' "); *id.* at 465, 103 S.Ct. at 2511.

At the outset, it is apparent that two factors imposed a low ceiling on any showing that the plaintiffs could have made. First, as the district court found, the "vast majority" of married women voluntarily inform their husbands before seeking an abortion. *Planned Parenthood v. Casey,* 744 F.Supp. 1323, 1360 (E.D.Pa.1990). Indeed, in the trial testimony on which the district court relied, the plaintiffs' witness stated that in her experience 95% of married women notify their husbands. App. at 701. Second, the overwhelming majority of abortions are sought by unmarried women.[3] Thus, it is immediately apparent that Section 3209 cannot affect more than about 5% of married women seeking abortions or an even smaller percentage of all women desiring abortions.

The plaintiffs failed to show even roughly how many of the women in this small group would actually be adversely affected by Section 3209. As previously noted, Section 3209 contains four significant exceptions. These exceptions apply if a woman certifies that she has not notified her husband because she believes[4] that (1) he is not the father of the child, (2) he cannot be found after diligent effort, (3) the pregnancy is the result of a spousal sexual assault that has been reported to the authorities, or (4) she has reason to believe that notification is likely to result in the infliction of bodily injury upon her. If Section 3209 were allowed to take effect, it seems safe to assume that *some* percentage of the married women seeking abortions without notifying their husbands would qualify for and invoke these exceptions. The record, however, is devoid of evidence showing how many women could or could not invoke an exception.

Of the potentially affected women who could not invoke an exception, it seems safe to assume that *some* percentage, despite an initial inclination not to tell their husbands, would notify their husbands without suf-

U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987)). Thus, proof that the provision would adversely affect an unknown number of women with a particular combination of characteristics could not suffice.

**2.** In *Thornburgh,* Justice O'Connor made clear that a party challenging the constitutionality of a statute must bear the burden of proving that the law imposes an undue burden. After arguing strenuously that the case should be sent back to the district court for "additional factual development" (476 U.S. at 827, 106 S.Ct. at 2213 (O'Connor, J., dissenting), Justice O'Connor repeatedly stated that the appellees, who were challenging the statute, had the burden of proving that individual statutory provisions would impose an undue burden. She discussed whether "appellees could succeed in making the threshold showing of undue burden" (*id.* at 831, 106 S.Ct. at 2215), whether "appellees [could]

establish that the abortion decision [would be] unduly burdened" (*id.*), and whether the appellees "could succeed in establishing an undue burden" (*id.* at 832, 106 S.Ct. at 2216).

**3.** Since 1973, abortions on unmarried women have consistently exceeded 70% of the national total and at times have surpassed 80%. *United States Department of Commerce, Statistical Abstract of the United States 1990* at 71.

**4.** The form prepared by the Pennsylvania Department of Health for use in implementing Section 3209 requires a woman to certify that she has not notified her husband "for the following reason(s). . . ." (744 F.Supp. at 1359). Moreover, a false statement is punishable (as a third degree misdemeanor) only if the woman did not "believe [the statement] to be true" (18 Pa.Cons.Stat.Ann. § 4904(b) (1983)).

fering substantial ill effects. Again, however, the record lacks evidence showing how many women would or would not fall into this category. Thus, the plaintiffs did not even roughly substantiate how many women might be inhibited from obtaining an abortion or otherwise harmed by Section 3209.[5] At best, the record shows that Section 3209 would inhibit abortions " 'to some degree' " or that "some women [would] be less likely to choose to have an abortion by virtue of the presence" of Section 3209. *Thornburgh,* 476 U.S. at 828, 106 S.Ct. at 2214 (O'Connor, J., dissenting), quoting *Akron,* 462 U.S. at 464, 103 S.Ct. at 2510 (O'Connor, J., dissenting).[6] And even with respect to these women, the plaintiffs did not show that the impact of Section 3209 would be any greater or any different from the impact of the notice requirement upheld in *Matheson.* Consequently, the plaintiffs failed to prove that Section 3209 would impose an undue burden.

Needless to say, the plight of any women, no matter how few, who may suffer physical abuse or other harm as a result of

---

5. In considering whether Section 3209 would impose an undue burden, I do *not* take into account a fact that seems glaringly apparent, i.e., that Section 3209 would be difficult to enforce and easy to evade. Section 3209 does not require a woman to provide any proof of notification other than her own unnotarized statement. Thus, if a woman claimed that she had orally notified her husband in private (the mode and place of notification to be expected in most cases), it would be exceedingly difficult in most cases for the Commonwealth to prove beyond a reasonable doubt that she had not done so.

Proving that a woman violated the law due to a false statement concerning one of the exceptions would also be hard. As noted (*see* footnote 4, *supra*), the Commonwealth would have to prove that the woman did not "believe [the statement] to be true" (18 Pa.Cons.Stat.Ann. § 4904(b) (1983)). Consequently, if a woman certified that she did not notify her husband because he was not the father, the Commonwealth would have to prove that she subjectively believed that the husband was the father. Or, if a woman certified that she did not notify her husband because she had reason to believe that this would lead to the infliction of bodily injury upon her, the Commonwealth would have to prove that the woman subjectively believed that she would not be harmed. It seems likely, therefore, that Section 3209, if allowed to take effect, would be widely evaded and infrequently enforced and would consequently be less likely to produce either the good or bad effects that the opposing parties claim.

6. The plaintiffs' proof may be separated into five categories. First, they offered testimony that a spousal notification requirement would sometimes delay an abortion or necessitate an extra trip to the abortion provider (*see* 744 F.Supp. at 1360). But as the majority properly concludes in rejecting identical objections to the 24-hour waiting period required by Section 3205(a) (see majority opin. at 706–07), these potential effects do not amount to an undue burden. *See Akron,* 462 U.S. at 472–74, 103 S.Ct. at 2515–16 (O'Connor, J., dissenting).

Second, the plaintiffs offered testimony that the exceptions in Section 3209 would not cover a case in which a woman did not want to notify her husband for fear that he would retaliate in some way other than the infliction of bodily injury upon her, such as by subjecting her to psychological abuse or abusing their children (*see* 744 F.Supp. at 1360–62). The plaintiffs, however, do not appear to have offered any evidence showing how many (or indeed that *any* actual women) would be affected by this asserted imperfection in the statute.

Third, the plaintiffs introduced general evidence about the problem of spouse abuse (*see* 744 F.Supp. at 1361). They offered widely varying statistics concerning the dimensions of the problem, as well as evidence that battering occurs in all socioeconomic groups and is sometimes fatal. This proof, while documenting the existence of a broad national problem, provides no basis for any estimate of what is relevant here—the impact of Section 3209.

Fourth, the plaintiffs offered evidence that "mere notification of pregnancy is frequently a flashpoint for battering" (*see* 744 F.Supp. at 1361). This proof indicates *when* violence is likely to occur in an abusive marriage but provides no basis for determining how many women would be adversely affected by Section 3209. Finally, the plaintiffs offered the opinion of one of their witnesses that most battered women would be psychologically incapable of taking advantage of Section 3209's fourth exception, i.e., the exception for cases in which the woman has reason to fear that notification will lead to the infliction of bodily harm upon her (*see* 744 F.Supp. at 1363). However, the plaintiffs failed to show how many of the women potentially affected by Section 3209 (married women seeking abortions without notifying their husbands) are victims of battering. Thus, the opinion offered by their expert, even if taken at face value, merely describes the likely behavior of most of the women in a group of unknown size. Clearly, then, this evidence does not show how many women would be inhibited or otherwise harmed by Section 3209. I cannot believe that a state statute may be held facially unconstitutional simply because one expert testifies that in her opinion the provision would harm a completely unknown number of women.

this provision is a matter of grave concern. It is apparent that the Pennsylvania legislature considered this problem and attempted to prevent Section 3209 from causing adverse effects by adopting the four exceptions noted above. Whether the legislature's approach represents sound public policy is not a question for us to decide. Our task here is simply to decide whether Section 3209 meets constitutional standards. The first step in this analysis is to determine whether Section 3209 has been shown to create an undue burden under Supreme Court precedent, and for the reasons just explained it seems clear that an undue burden has not been established.

B. This conclusion is not undermined (and may indeed be supported) by the portion of Justice O'Connor's opinion in *Hodgson* regarding the constitutionality of the two-parent notice requirement without judicial bypass. The majority in this case interprets Justice O'Connor's opinion to mean that this requirement imposed an undue burden and did not serve a "compelling" interest. Majority opin. at 696. I interpret Justice O'Connor's opinion differently. I do not read her opinion to mean that the two-parent notice requirement without judicial bypass constituted an undue burden. Rather, I interpret her opinion to mean that this requirement was unconstitutional because it was not reasonably related to a legitimate state interest. Thus, I do not believe that her opinion (or the Court's holding) supports the majority's conclusion in the present case that the spousal notification requirement in Section 3209 imposes an undue burden.

In *Hodgson*, Justice Stevens wrote the lead opinion discussing the unconstitutionality of the two-parent notification requirement without judicial bypass, and Justice O'Connor joined most of Justice Stevens' opinion (*see* 110 S.Ct. at 2949 (O'Connor, J., concurring). Thus, in interpreting Justice O'Connor's position, it is helpful to begin with the relevant portions of Justice Stevens' opinion.

Two portions of Justice Stevens' opinion, Parts III and VII, are most important for present purposes. In Part III, Justice Ste-

vens discussed the applicable constitutional standard. Nowhere in this portion of his opinion (or indeed in any portion of his opinion) did Justice Stevens make reference to "strict," "exacting," or "heightened" scrutiny or any of the terminology associated with that level of review. Instead, he concluded that the statute failed to satisfy even the least demanding standard of review. He wrote (110 S.Ct. at 2937): "Under any analysis, the . . . statute cannot be sustained if the obstacles it imposes are not reasonably related to legitimate state interests."

In Part VII of his opinion, Justice Stevens explained (*id.* at 2945) why the two-parent notice requirement did not "reasonably further any legitimate state interest." Thus it seems clear that Justice Stevens' opinion concluded that the two-parent notice requirement without judicial bypass was unconstitutional because it failed some variant of the rational relationship test.

In my view, Justice O'Connor's opinion in *Hodgson* did not subject this requirement to a more exacting level of scrutiny. Although Justice O'Connor did not join Part III of Justice Stevens' opinion (in which he discussed the general constitutional standard that he applied), Justice O'Connor wrote as follows (110 S.Ct. at 2949–50 (emphasis added)):

It has been my understanding in this area that "[i]f the particular regulation does not 'unduly burde[n]' the fundamental right, . . . then our evaluation of that regulation is limited to our determination that the regulation rationally relates to a legitimate state purpose." . . . . *It is with that understanding that I agree with Justice Stevens' statement "that the statute cannot be sustained if the obstacles it imposes are not reasonably related to legitimate state interests."*

I interpret this to mean that Justice O'Connor agreed with Justice Stevens that the challenged statute should be judged under the rational relationship test. I do not think that she would have expressed general agreement with Justice Stevens' statement of the governing legal standard if she believed that the statute imposed an

undue burden and was thus required to satisfy an entirely different legal standard. I also do not think that she would have concluded that the statute created an undue burden without explaining the basis for that conclusion. Moreover, Justice O'Connor joined Part VII of Justice Stevens' opinion, in which, as previously noted, Justice Stevens concluded that the two-parent notice requirement without judicial bypass was not "reasonably" related to any "legitimate interest." I do not think that Justice O'Connor would have joined this portion of Justice Stevens' opinion if her position regarding the constitutionality of the provision was based on a fundamentally different analysis. Thus, I conclude that Justice O'Connor found the two-parent notice statute unconstitutional under the rational relationship test. This must mean either (a) that she did not believe that this requirement constituted an undue burden or (b) that she did not find it necessary to reach that question because she believed that the requirement could not even pass the rational relationship test. In either event, her position in no way undermines my conclusion that Section 3209 has not been shown to create an undue burden.[7]

### III.

Since Section 3209 has not been proven to impose an undue burden, it must serve a "legitimate" (but not necessarily a "compelling") state interest. The majority acknowledges that this provision serves a "legitimate" interest, namely, the state's interest in furthering the husband's interest in the fetus. *See* majority opin. at 715, 716. I agree with this conclusion, and I do not think that this point requires extended discussion.

The Supreme Court has held that a man has a fundamental interest in preserving his ability to father a child. *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942). The Court's opinions also seem to establish that a husband who is willing to participate in raising a child has a fundamental interest in the child's welfare. *Michael H. v. Gerald D.*, 491 U.S. 110, 123, 109 S.Ct. 2333, 2342, 105 L.Ed.2d 91 (1989); *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); *Caban v. Mohammed*, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1969); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). It follows that a husband has a "legitimate" interest in the welfare of a fetus he has conceived with his wife.

To be sure, the Supreme Court held in *Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 67–72, 96 S.Ct. 2831, 2840–43, 49 L.Ed.2d 788 (1976), that a potential father may not be given the legal authority to veto an abortion, and thus the Court apparently held that the potential father's interest was not "compelling." But the Court did not question the *legitimacy* of this interest. On the contrary, the Court wrote (*id.* at 69, 96 S.Ct. at 2841 (emphasis added)): "We are not unaware of the *deep and proper* concern and *interest* that a devoted and protective husband has in his wife's pregnancy and in the growth and development of the fetus she is carrying." *See also id.* at 93, 96 S.Ct. at 2852 (White, J., dissenting) ("A father's interest in having a child—perhaps his only child—may be unmatched by any other interest in his life"). Since a "deep and proper ... interest" appears indistinguishable from a "legitimate" interest, it seems clear that a husband has a "legitimate" interest in the fate of the fetus.

This interest may be legitimately furthered by state legislation. "[S]tatutory regulation of domestic relations [is] an area

7. In the portion of her opinion concluding that the two-parent notification requirement with judicial bypass was constitutional, Justice O'Connor wrote (110 S.Ct. at 2950 (emphasis added)): "In a series of cases, this Court has explicitly approved judicial bypass as a means of tailoring a parental *consent* provision so as to avoid unduly burdening the minor's limited right to obtain an abortion." I interpret this statement to mean that a judicial bypass option prevents a consent requirement (which would otherwise amount to an absolute veto) from creating an undue burden. This statement is therefore fully consistent with my view that Justice O'Connor did not find that an undue burden was created by the two-parent *notice* requirement without judicial bypass.

that has long been regarded as a virtually exclusive province of the States." *Sosna v. Iowa,* 419 U.S. 393, 404, 95 S.Ct. 553, 560, 42 L.Ed.2d 532 (1975). *See also Moore v. East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977); *Scheinberg v. Smith,* 659 F.2d 476, 483–94 (5th Cir.1981). Accordingly, Pennsylvania has a legitimate interest in furthering the husband's interest in the fate of the fetus, as the majority in this case acknowledges.

### IV.

The remaining question is whether Section 3209 is "rationally" or "reasonably" related to this interest. Under the rational relationship test, which developed in equal protection cases, "legislation carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." *Hodel v. Indiana,* 452 U.S. 314, 331–32, 101 S.Ct. 2376, 2386–87, 69 L.Ed.2d 40 (1981). This test does not permit the invalidation of legislation simply because it is "deemed unwise or unartfully drawn." *U.S. Railroad Retirement Board v. Fritz,* 449 U.S. 166, 175, 101 S.Ct. 453, 459, 66 L.Ed.2d 368 (1981). Legislation does not violate this test simply because it produces some adverse effects. *Id.; Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911). As the Court wrote in *Dandridge v. Williams,* 397 U.S. 471, 485–86, 90 S.Ct. 1153, 1161–62, 25 L.Ed.2d 491 (1970):

> "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Metropolis Theatre Co. v. City of Chicago,* 228 U.S. 61, 68–70 [33 S.Ct. 441, 443, 57 L.Ed. 730 (1913)]....

> ... [The rational-basis standard] is true to the principle that the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy.

*See also Dallas v. Stanglin,* 490 U.S. 19, 25–27, 109 S.Ct. 1591, 1595–96, 104 L.Ed.2d 18 (1989); *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439–40, 105 S.Ct. 3249, 3253–54, 87 L.Ed.2d 313 (1985). Rather, "those challenging the legislative judgment must convince the Court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979). *See also Hancock Industries v. Schaeffer,* 811 F.2d 225, 238 (3d Cir. 1987).

Even assuming that the rational relationship test is more demanding in the present context than in most equal protection cases, that test is satisfied here. The Pennsylvania legislature could have rationally believed that some married women are initially inclined to obtain an abortion without their husbands' knowledge because of perceived problems—such as economic constraints, future plans, or the husbands' previously expressed opposition—that may be obviated by discussion prior to the abortion. In addition, the legislature could have reasonably concluded that Section 3209 would lead to such discussion and thereby properly further a husband's interests in the fetus in a sufficient percentage of the affected cases to justify enactment of this measure. Although the plaintiffs and supporting amici argue that Section 3209 will do little if any good and will produce appreciable adverse effects, the Pennsylvania legislature presumably decided that the law on balance would be beneficial. We have no authority to overrule that legislative judgment even if we deem it "unwise" or worse. *U.S. Railroad Retirement Board v. Fritz,* 449 U.S. at 175, 101 S.Ct. at 459. "We should not forget that 'legislatures are ultimate guardians of the liberty and welfare of the people in quite as great a degree as the courts.'" *Akron v. Akron Center For Reproductive Health,* 462 U.S. at 465, 103 S.Ct. at 2511 (O'Connor, J., dissenting), *quoting Missouri, K. & T.R. Co. v. May,* 194 U.S. 267, 270, 24 S.Ct. 638, 639, 48 L.Ed. 971 (1904). Clearly, the plaintiffs have not shown that "the legislative facts on which [the statute] is apparently based could not reasonably be conceived to be true by the governmental deci-

sionmaker." *Vance v. Bradley*, 440 U.S. at 111, 99 S.Ct. at 949. Thus, Section 3209 is rationally related to a legitimate state interest and may not be invalidated under the Supreme Court's abortion precedents.[8]

8. The plaintiffs argue that the district court's decision may be affirmed on alternative constitutional grounds not adopted by that court, *i.e.*, that Section 3209 violates the rights to marital and informational privacy and equal protection. Because the majority has relied solely on the abortion right in affirming the district court, I do not address these alternative grounds.